## STATE v. WILLIAMS

No. 2753

July 5, 1927. 257 P. 619.

1. JURY—CONSCIENTIOUS OPINIONS.

Veniremen, who stated they entertained such conscientious opinions as would preclude them from finding defendant guilty in a capital case, *held* incompetent to serve as jurors in trial thereof, in view of Stats. 1919, c. 232, sec. 51, notwithstanding statement that, if compelled to serve as jurors, they would obey the instructions of the court and decide the case in accordance with the law and the evidence.

2. CRIMINAL LAW—WITNESSES—PHOTOGRAPHS.

In murder prosecution, where it was state's theory that defendant killed deceased and dragged his body to a safe to have it appear that he shot him while attempting to rob, and where the scene of homicide was reconstructed and photographs taken thereof, permitting state witness to testify from photographs illustrating state's hypothetical theories and admitting photographs in evidence *held* not error.

3. CRIMINAL LAW—EVIDENCE—PHOTOGRAPHS.

In murder prosecution, court did not err in sustaining objection to defendant's offer in evidence of a bust photograph of deceased, from which jury might have formed opinions as to credibility of defendant's testimony that deceased was a drug addict and ex-convict.

4. CRIMINAL LAW—EVIDENCE.

In murder prosecution, where it was state's theory that defendant killed deceased and dragged his body to a safe to make it appear deceased was attempting to rob, denial of defendant's motion to strike answer of witness as to doubt in his mind as to whether mark on the floor was streaks of blood or made by dragging of heels *held* not error.

5. HOMICIDE—EVIDENCE OF CHARACTER.

In murder prosecution, where defendant in giving account of killing stated he believed deceased intended to execute threats to kill him, and, knowing he was a drug addict, he was more afraid of him than he might have been otherwise, testimony of defense witness that deceased's habits were those of a drug addict were incompetent until defendant first established that deceased was a violent and dangerous person.

6. HOMICIDE—EVIDENCE OF CHARACTER.

In murder prosecution, limiting examination of defense witness that habitual use of drugs made the user a violent and dangerous person was not error, where defendant did not first establish that deceased was a violent and dangerous person.

7. CRIMINAL LAW—EVIDENCE OF CHARACTER.

Fact that a person's habits or character are such that he would be apt to do an act is not competent evidence that he did the act.

8. CRIMINAL LAW—EVIDENCE—COLLATERAL MATTERS.

In murder prosecution, error, if any, in permitting cross-examination of defendant as to collateral matter involving defendant's trade of watches with deceased to show motive *held* not prejudicial, where state failed to show motive and was bound by defendant's answers.

9. CRIMINAL LAW—PERMITTING JURY TO TAKE PHOTOGRAPHS.

In murder prosecution, court did not err, in view of Rev. Laws, 7206, in permitting jury to take to their room photographs properly admitted in evidence.

10. HOMICIDE—EVIDENCE HELD TO SUSTAIN CONVICTION.

In prosecution for murder in the first degree by shooting with a pistol, evidence *held* sufficient to sustain conviction.

### C. J.–CYC. REFERENCES

CRIMINAL LAW—16 C. J. sec. 1129, p. 586, n. 83 (new) ; sec. 1528, p. 744, n. 11 ; p. 745, n. 19 (new) ; sec. 1537, p. 750, n. 84 ; sec. 2543, p. 1083, n. 43 ; sec. 3657, p. 312, n. 44.

HOMICIDE—30 C. J. sec. 396, p. 174, n. 3, 15 ; sec. 559, p. 312, n. 42.

JURIES—35 C. J. sec. 392, p. 354, n. 34 ; p. 356, n. 49.

WITNESSES—40 Cyc. p. 2416, n. 42.

APPEAL from Second Judicial District Court, Washoe County; *Geo. A. Bartlett,* Judge.

W. F. Williams was convicted of murder in the first degree, and he appeals. **Affirmed.**

*Roberts, Scanlan & Ingram,* for Appellant:

Conscientious scruples against death penalty do not disqualify if juror can render proper verdict notwithstanding them. 35 C. J. 355.

Improper allowance of challenge by prosecution may cause reversal. People v. Stewart. 7 Cal. 140.

Photographs of things in assumed positions to illustrate hypothetical situation or explain certain theory are incompetent. Colonial Refining Co. v. Lathrop, L. R. A. 1917F, 890.

Photograph shown to be faithful representation of

what it purports to show is admissible. Photograph of deceased, showing his size, aggressive and dangerous appearance, is most material in support of defendant's testimony that he acted in self-defense. Defendant's justification is his belief in impending injury. Violent and dangerous character of defendant may be shown when justification of homicide is questioned. 30 C. J. 174; 1 Wigmore (2d ed.), sec. 245. Defendant has right to act on appearances and determine his danger. Idem, sec. 248.

Court erred in restricting evidence of doctor that drug addicts are generally violent, dangerous and irresponsible for purpose of showing defendant had reason to be apprehensive. Idem.

*M. A. Diskin,* Attorney-General; *Wm. Forman, Jr.,* Deputy Attorney-General; *L. D. Summerfield,* District Attorney, and *H. L. Heward,* Deputy District Attorney, for Respondent:

Juror is incompetent in capital case who states he has conscientious scruples against inflicting death penalty, even though he further states if satisfied of defendant's guilt he would render verdict accordingly. It is not error for court to excuse him without further examination. 35 C. J. 355, 396; People v. Goldenson, 19 P. 161.

It is not error to admit photograph of scene with things arranged by eyewitness. That is not hypothetical situation. In People v. Maughs, 149 Cal. 265, markers were placed to better illustrate testimony. In State v. Clarke, 48 Nev. 134, jury inspected scene with automobile parked in position as testified to by witness.

It was not error to exclude photograph of defendant, admittedly bust picture, when there was no foundation laid, no witness testified it was true likeness, or when it was taken, and which did not disclose anything of size, weight, strength, etc.

No proper foundation was laid for introduction of character evidence. That complaints were made to witness that deceased was drug addict does not qualify her. Inquiry should be limited to whether deceased

was violent and dangerous, and not extend to general character or disassociated characteristics. 30 C. J. 229; State v. Boyle, 49 Nev. 386.

Assignment of error states doctor was called to testify drug addicts are "generally considered," etc. It is hard to tell whether he was character or expert witness. There is no need to call expert to testify to what is "generally considered." Evidence was properly rejected. Jackson v. State, 59 So. 171.

Character evidence to show deceased was aggressor is restricted to general reputation. Witness may not state his opinion. Evidence is limited to violence, belligerency and uncontrolled passion. 13 R. C. L. sec. 222.

Prosecution is given utmost leeway in cross-examination of motives when defendant has told complete story admitting killing and giving reasons.

## OPINION

By the Court, SANDERS, C. J.:

The defendant, W. F. Williams, was convicted of murder of the first degree for shooting one H. D. Kelly to death with an automatic Colt revolver, and was sentenced to confinement in the penitentiary for the term of his natural life. The defendant appeals from an order denying his motion for a new trial and from the judgment.

So far as necessary to a proper understanding of the numerous assignments of error relied upon for the reversal of the case, the following summary of the evidence will be sufficient.

At the time of the killing both the defendant and the deceased were employed as barbers, the defendant in the barber shop of F. H. Hartung, on North Virginia Street, and the deceased in the Vanity Shop, on First Street, in the city of Reno. The homicide occurred between the hours of 1 and 2 o'clock on the morning of the 19th day of April, 1926, in Hartung's barber shop. There were no eyewitnesses, and nothing was known of the killing until the defendant telephoned to his employer

at his residence, stating, "You had better come down, they are robbing the safe." The defendant also telephoned J. M. Kirkley, chief of police, at his residence, whereupon Kirkley telephoned Police Officer Wilkinson to go to Hartung's barber shop. When Hartung arrived, he recognized the dead body lying on the floor as being that of Kelly. Eight shots had been fired from the defendant's revolver, two of which went wild and six of which struck the deceased, causing fourteen wounds. The defendant admitted the killing, but made no statement as to the cause until he had been taken to the police station, where he was questioned by Chief of Police Kirkley as to how it occurred. The defendant stated to Kirkley that he had occasion to go to the barber shop, and when he went inside he heard water running, and just as he turned on the light he saw a man standing at the safe; that he pulled his gun and asked him what he was doing. The man made no reply, and he asked him the second time and getting no answer he shot.

At about the hour of 10:30 on the morning of the homicide the defendant was taken from his cell and confronted with the chief of police, the sheriff, and the district attorney, and was asked by the sheriff for a statement as to how the killing occurred. The defendant stated, in substance, that he and the deceased had met at about 8 or 9 o'clock in the evening in Douglas Alley; that they went down the alley and bought a bottle, had a drink apiece, and Kelly discovered that he had lost his barber case; that a third party informed him where the case was; and that either he or the deceased gave the party four bits to go and get the barber case. After that Kelly said that he wanted to get shaved and asked him, "Do you think you are too drunk to shave me?" and he replied, "No; I am not. Come on, we will go down in the barber shop, and I will shave you." He stated that he shaved him, and while cleaning up he noticed Kelly taking a pair of clippers off the stand and putting them in his barber case. He asked him what he was doing, and Kelly replied that he was going to take the clippers. He told him he could not do that and

Kelly said, "Why can't I? What the hell is it to you whether I do it or not?" Kelly then walked over to the safe and said that he was going to open the safe, and he told him that he could not do that, that he was in charge of the barber shop and was responsible, and that he could not open the safe. Kelly then stepped over in the direction of the safe and he ordered him to stop. He ordered him again to stop, and when he ordered him the third time he shot him three or four times, and then telephoned to Hartung and to the chief.

After the homicide occurred the furnishings in the barber shop were rearranged and the safe removed. Afterward, at the request of the district attorney, F. H. Hartung reconstructed the scene in the shop by placing objects therein to represent the pool of blood, the body of the deceased, the barber case, and the safe as they appeared at the time of the homicide. Three photographs were taken of the reconstructed scene, and upon the trial Hartung and other witnesses for the state were permitted to testify from them.

Upon the trial the defendant gave substantially this account of the killing:

That he had known the deceased about six months, but not intimately; that they were together from 8 or 9 o'clock until the killing occurred; that during the evening the deceased asked him if he was too drunk to shave him, as he wanted to be shaved, but was drunk and would be too nervous to shave himself before going to work at 8 o'clock the next morning; that when they entered the shop Kelly fastened the door and spent a few moments in looking around the shop, all the time talking in a friendly way. Kelly took a bottle from his barber case, and they each had a drink; that he went to his workstand and unlocked the drawer that held his tools and a gun and shaved the deceased, who appeared to be restless and nervous. When he had finished shaving him, Kelly conversed about matters concerning the business of the shop and stated that he was in need of tools and walked across the room to Mr. Hartung's barber chair and took a pair of clippers off the stand and said

he was an expert safe cracker, then he took the clippers in his left hand and bent over the safe and turned the tumblers; that he told him to stop and not to do anything like that, that he was responsible for everything in the shop and to put the clippers back and get away and remonstrated with the deceased and protested against the opening of the safe; that Kelly used very offensive, insulting, and threatening words and said, "I will silence you, and then I can do as I please." During the affray, the deceased grappled with him for the gun. He said, "I was scared, for I thought he meant business, as I knew that he was an addict and an ex-convict, and all that, that scared me all the more." He said he fired one shot to attract attention, and fired the second shot as they ran around the room; that Kelly grabbed the headrest off Hartung's barber chair and said, "I will cave your damn head in"; that he then pointed the gun toward Kelly and told him to stop, then becoming desperate he shot, he did not know how many times, and did not realize what had happened until he saw the body of the deceased lying head forward near Hartung's chair, about 6 or 7 feet from the safe; that he did not touch the body of the deceased, but called Mr. Hartung and the chief of police.

Upon the conclusion of the evidence, the jury were fully instructed upon the law of murder, the degrees of murder, self-defense, and justifiable homicide.

We shall review the assignments of error in the order of the argument:

1. First, that the court erred in limiting and restricting the examination of William V. Lane and Joe El Cano and other veniremen on voir dire, with respect to determining whether or not the veniremen had such conscientious opinions as would preclude them from inflicting the death penalty.

The record does not support this assignment. From a review of the examination of the veniremen we conclude that to qualify as jurors in this case they would have had to violate either their consciences or their oaths. The statute provides that:

"If the offense charged is punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror." Statutes 1919, p. 426.

It is argued that, though the veniremen stated they entertained such conscientious opinions as would preclude them from finding the defendant guilty, if compelled to serve as jurors, they would obey the instructions of the court and decide the case in accordance with the law and the evidence. From this it is contended that the veniremen were competent to serve as jurors. By the weight of authority a juror is incompetent in a capital case who states that he has conscientious scruples against finding defendant guilty of an offense punishable by death, although he further states that, if satisfied beyond a reasonable doubt of defendant's guilt, he would render a verdict accordingly. 35 C. J. 355. The authorities cited in the note in support of the text are in accord with the letter and spirit of our statute, and we find no error in the sustaining of the challenges interposed by the state.

2. Second, that the court erred in permitting the witness F. H. Hartung, called by the state, to testify from three photographs which illustrated hypothetical theories of the state, and in admitting the photographs in evidence.

It was the contention of the state that a streak of blood leading from a pool of blood on the floor, 12 feet from where the body was found, was a circumstance showing that the body of the deceased had been dragged from the pool of blood, where it had fallen, by the defendant to the safe in order to make it appear that he shot the deceased while deceased was attempting to rob the safe.

Counsel for the defendant contend that the photographs were evidence manufactured by the state to destroy the defendant's defense that he shot the deceased in an attempt to rob the safe.

It is true, the photographs were in a sense manufactured evidence, but not in an offensive sense, as argued

by counsel. The photographs taken under the circumstances, under which the evidence shows them to have been taken, could not have been understood by the jury as being exact representations of the scene of the homicide. The photographs were intended (as maps or diagrams might be used) merely for the purpose of illustrating the conditions present at the time of the killing: We see no valid ground for objection to the use by the witnesses of the photographs, to give to the jury more accurate information of the facts, as the witnesses testified them to be, than they could give by the spoken word. State v. Matthews, 191 N. C. 378, 131 SE. 743. And, so considered, we are of opinion that no error was committed by their introduction in evidence. People v. Singh (Cal. App.), 248 P. 981, and cases cited.

3. Third, that the court erred in sustaining the state's objection to defendant's offering in evidence a bust photograph of the deceased, from which the jury might have formed opinions as to the credibility of defendant's testimony relative to the character of the deceased. It is held that, in a prosecution for murder, a photograph of deceased, offered in evidence to show deceased's appearance in his lifetime and to allow the jury to see his character from his picture, was properly excluded. People v. Bannon, 59 Cal. App. 50, 209 P. 1029. The photograph was properly rejected.

4. Fourth, that the court erred in denying defendant's motion to strike out the answer of the witness Frederick Morris, "A doubt in my mind whether this was streaks of blood or made by dragging of the heels." We find no error in the court's ruling.

5. Fifth, that the court erred in limiting and restricting the examination of Lillian T. Shaw, a witness called by the defendant.

6. Sixth, that the court erred in limiting and restricting the examination of Dr. A. F. Adams, a witness called by the defendant, as an expert.

7. These assignments may be considered together. The defendant, in giving his account of the killing, stated, in substance, that he believed the deceased intended to execute his threats to kill him, and knowing

the deceased to be a drug addict he was more afraid of him than he otherwise might have been. The defendant sought to establish by the witness Shaw that the deceased's character and habits were those of a drug addict, and to establish by the witness Adams that the habitual use of drugs makes the user a violent and dangerous person. The defendant's argument in support of his exception to the exclusion of the proffered testimony is that from such evidence the jury could infer that the deceased was the aggressor and the defendant's fear of the deceased was well grounded, and that the evidence would tend to corroborate his testimony that he believed the defendant intended to kill him. The fact that a person's habits or character are such that he would be apt to do an act is not competent evidence that he did the act. Doing an act cannot be proved by evidence that from the habits of a person he would be apt to do it. Commonwealth v. Rivet, 205 Mass. 464, 91 NE. 877. So, in this case, the fact that the deceased was a drug addict and that drug addicts are generally dangerous persons would not be competent evidence from which the jury could infer that the deceased was the aggressor or that the defendant's fear of the deceased was well grounded. We conclude that the trial court correctly ruled that such evidence would not be competent until the defendant had first established that the deceased was a violent and dangerous person.

8. Seventh, that the court erred in permitting the state, upon the cross-examination of the defendant, to inquire into a collateral matter involving a trade of watches between the defendant and the deceased made a few days prior to the killing to show motive. The record discloses that, upon the defendant's objections, the district attorney stated that the questions were merely preliminary to show motive. It is stated generally in Wharton's Criminal Evidence, vol. 1, p. 906, that ordinarily a witness cannot be examined as to another person's motives, but as to the accused's own motives, when relevant, he may be examined in chief or upon cross-examination.

We are satisfied that the state in its examination of the defendant utterly failed to show motive arising from the watch transaction, and the state being bound by the answers of the defendant, with respect to this collateral matter, no prejudice resulted to the defendant.

9. Eighth, that the court erred in permitting the jury to take to their room the photographs admitted in evidence. The photographs having been properly admitted, we find no prejudicial error in permitting them to be taken to the jury room as a part of the papers in the case. Section 7206, Rev. Laws; People v. Balestieri, 23 Cal. App. 708, 139 P. 821.

The ninth, tenth, eleventh, twelfth, and thirteenth assignments of error are directed to the defendant's exceptions to certain instructions given at the request of the state. We have examined the instructions and find that they are substantially the same as instructions heretofore approved by this court in homicide cases, and that they contain principles of law so often considered that we shall decline to review them for the purpose of answering argument.

Fourteenth, this assignment was abandoned in argument.

The fifteenth, sixteenth, and seventeenth assignments are directed to the defendant's exceptions to the refusal of the court to give certain instructions requested by the defendant. We are of opinion that the record supports the reasons indorsed by the trial court upon each instruction for its refusal.

Eighteenth, it is contended generally that the verdict in this case is contrary to the evidence and that the evidence does not support the judgment.

10. The killing was a most atrocious act, and we cannot say from the evidence that the jury were not justified in finding the defendant guilty of murder of the first degree.

Finding no reversible error in the record, the judgment is affirmed.