## In the Matter of the Application of JOHN A. KRAMER for a Writ of Habeas Corpus.

No. 3358

February 28, 1942. 122 P. (2d) 862.

*Oliver C. Custer, Grant L. Bowen,* and *John E. Robinson,* all of Reno, for Petitioner.

*Gray Mashburn,* Attorney-General, *W. T. Mathews* and *Alan Bible,* Deputy Attorneys-General, of Carson City, and *John W. Bonner,* District Attorney of Ely, for Respondent.

## OPINION

By the Court, TABER, J.:

An information was filed on February 20, 1940, in the Seventh judicial district court, White Pine County, charging petitioner with the crime of murder of the first degree. On the same day he appeared for arraignment, and informed the court that he was without means to employ counsel. Thereupon the court assigned Mr. James M. Collins, of Ely, as counsel to defend him. Arraignment was forthwith made, and upon request of petitioner's counsel he was given until February 26, 1940, to plead to the information. On that date he entered a plea of not guilty, and the trial was set for March 19, 1940. The trial commenced on that day and continued until March 22, 1940, when the jury returned a verdict of guilty of murder of the first degree. On March 25, 1940, petitioner was sentenced to death, and two days later placed in custody of the warden of the state prison, in whose custody he has remained until the present time.

No motion for new trial was made, but in May 1940 petitioner appealed to this court from the judgment of the district court, being represented on the appeal by Mr. Lewis W. Rogers, of Reno. The judgment of the trial court was affirmed November 19, 1940. Kramer v. State, 60 Nev. 262, 108 P.(2d) 304. No petition for rehearing was filed, but petitioner applied to the United States district court for a writ of habeas corpus. After a hearing, that court denied the writ, and petitioner appealed to the United States circuit court of appeals which, on September 9, 1941, affirmed the order. Kramer v. State of Nevada, 9 Cir., 122 F.(2d) 417. On November 29, 1941, petitioner applied to this court for a writ of habeas corpus. An alternative writ was issued, to which on December 3, 1941, respondent, as warden of the state prsion, filed his return, and his response to said petition. On December 4, 1941, petitioner filed his traverse and answer to said return. Respondent did not

file a reply to petitioner's traverse and answer, but this was not necessary because, under the well-established practice in habeas corpus proceedings, any new matter alleged in the traverse and answer is deemed to be denied. A full hearing was had, including the taking of considerable testimony, and on January 7, 1942, the matter was submitted to this court for decision. In all proceedings since the state district court's judgment of conviction was affirmed by this court, petitioner has been represented by Messrs. Grant L. Bowen, Oliver C. Custer, and John E. Robinson, all of Reno.

■ Petitioner excepted to the sufficiency of respondent's return upon the ground that the original warrant of execution was not produced and exhibited to this court at the time said return was read, heard, and examined by the court and filed with the clerk. This exception was argued by counsel and overruled by the court. We think the ruling was correct, for the reasons that follow. The exception was based upon that portion of sec. 11384 N. C. L. 1929, which reads: "If the party be detained by virtue of any writ, warrant or any other written authority, a copy thereof shall be annexed to the return, and the original shall be produced and exhibited to the judge on the hearing of such return." Subd. 3. Said sec. 11384 is sec. 10 of the habeas corpus act of 1862. Laws of Nevada Territory, 1862, chap. XCIII, pp. 98–103. It has remained unchanged since its enactment. When the habeas corpus act was passed and for many years thereafter, executions of persons sentenced to death took place at the respective county seats. Section 454 of the act to regulate proceedings in criminal cases, approved November 26, 1861, and in effect when the habeas corpus act was passed the following year, provided in part: "When judgment of death is rendered, a warrant, signed by the judge and attested by the clerk, under the seal of the court, shall be drawn and delivered to the sheriff; * * *." Laws of Nevada Territory, 1861, chap. CIV, p. 435, at p. 484.

This provision was superseded many years ago by sec. 11066 N. C. L. 1929, which reads:

"When a judgment of death has been pronounced, a certified copy of the entry thereof in the minutes of the court shall be forthwith executed and attested in triplicate by the clerk under the seal of the court. There shall be attached to said triplicate copies a warrant signed by the judge, attested by the clerk, under the seal of the court, which shall recite the fact of the conviction and judgment, and appoint a week within which the judgment is to be executed, which must not be less than sixty days nor more than ninety days from the time of judgment, and must direct the sheriff to deliver the prisoner to such authorized person as the warden of the state prison shall designate to receive the prisoner, for execution, such prison to be designated in the warrant. The original of such triplicate copies of the judgment and warrant shall be filed in the office of the county clerk, and two of such triplicate copies shall, by the clerk, be immediately delivered to the sheriff of the county; one of said triplicate copies to be delivered by the sheriff, with the prisoner, to such authorized person as the warden of the state prison shall designate, which shall be the warrant and authority of the warden of such state prison aforesaid for the imprisonment and execution of the prisoner, as therein provided and commanded, and the warden shall return his certified copy of the judgment to the county clerk of the county whence it was issued, and the other triplicate copy of such judgment and warrant to be the warrant and authority of said sheriff to deliver the prisoner to such authorized person so designated by the warden of the state prison; said last-mentioned copy to be returned to the county clerk by said sheriff with his proceedings endorsed thereon."

The triplicate copy, attested March 25, 1940, constituted the warrant and authority of the warden of the state prison for the imprisonment and execution of petitioner. It was produced and exhibited to this court on

the hearing of the return, and a copy annexed to the return. At the same time there was produced and exhibited to this court a certified copy of the warrant of execution which, on November 10, 1940, the trial court caused to be drawn, signed by the trial judge, attested by the clerk of the trial court, and delivered to respondent. A copy of this warrant was also annexed to the return. We hold that the attested triplicate copy of March 25, 1940, and the certified copy of the warrant of execution of November 10, 1940, constituted the original warrant and written authority by virtue of which petitioner was detained, within the provisions of said sec. 11384 N. C. L. 1929.

■ A stay of execution was ordered when petitioner applied to the United States district court for a writ of habeas corpus. After the order of that court denying the petition was affirmed by the United States circuit court of appeals, Kramer v. State of Nevada, 9 Cir., 122 F. (2d) 417, the state trial court on November 10, 1940, caused another warrant of execution to be drawn, signed by the trial judge, attested by the clerk of the trial court, and delivered to respondent. Petitioner contends that he was denied due process of law and equal protection of the laws under the constitution of the United States amend. 14, because said warrant of execution was drawn, signed, and attested without notice to him, and without his being present. There is no merit in this contention. Section 11077 N. C. L. 1929; People v. Sloper, 198 Cal. 601, 246 P. 802; Agnes v. People, 104 Colo. 527, 93 P. (2d) 891; Schwab v. Berggren, 143 U. S. 442, 12 S. Ct. 525, 36 L. Ed. 218; In re Spagnoli (Ex parte Wolfgang), 193 Cal. 472, 225 P. 274; Wolfgang v. People, 270 U. S. 627, 46 S. Ct. 206, 70 L. Ed. 768.

■■ Petitioner's contention that he was denied due process of law because the trial judge fixed the penalty without any jurisdiction so to do, thus usurping the function of the jury, is based chiefly upon the proposition that under the provisions of sec. 10068 N. C. L.

1929, the exclusive right and power to fix the punishment in first degree murder cases is vested in the jury where a defendant is found guilty upon trial by jury. It is the court's opinion now, as it was when the case of Kramer v. State, 60 Nev. 262, 108 P.(2d) 304, was decided, that the only discretion given the jury under that section is to fix the penalty at life imprisonment; that in this state the jury does not fix the penalty at life imprisonment by using the words "and recommend leniency," and that when the verdict is silent as to the punishment, or the jury cannot agree upon the penalty, the law fixes the penalty at death and requires the trial court to adjudge that punishment. We are convinced that when the statutory provision in question was adopted from California, it was the intention of the Nevada legislature that the statute should be construed in accordance with the views expressed in the early decisions of the California supreme court discussed in Kramer v. State, supra. The court is supported in this view by the authorities cited in that case. In one of the cases·there cited, this court said:

"It is a rule of construction too familiar to require the citation of authorities, that where one State adopts the statute of another, it is adopted with the construction placed upon it by the highest Court of judicature of the State from which it is taken. The reason upon which this rule rests, gives it an importance and weight which should not be disregarded except upon the most urgent reasons. When the Legislature of one State adopts the laws of another, it is presumed to know the construction placed upon those laws in the State from which they are adopted, and therefore that it adopts that construction with the law—that it incorporates into the law the construction which is placed upon it at the time it is adopted. Hence, for the Courts of the State adopting such laws to disregard such construction would be almost as unjustifiable as to disregard the clearly, expressed will of the Legislature itself." McLane v. Abrams, 2 Nev. 199, 206, 207.

■ It is also the rule that if, subsequent to the enactment of the statute by the adopting state, the highest court of the original state places a different construction upon the statute from that placed upon it by that court prior to its enactment by the legislature of the adopting state, the courts of the latter will follow the construction placed on the statute by the highest court of the original state before its enactment in the adopting state. See cases cited in 59 C. J., p. 1072, n. 19; and in Crawford, Statutory Construction, sec. 235, p. 444.

There are, it is true, exceptions to the foregoing general rules, but no good reason appears for departing from them in this case. People v. Welch, 49 Cal. 174, and People v. French, Cal. Sup., 7 P. 822, rehearing 69 Cal. 169, 10 P. 378, were decided at times when the supreme court of California was presumably familiar with the history of legislation concerning the penalty for first degree murder. That both of those cases received the careful attention of the court is evidenced by the fact that a rehearing was had and a further opinion written in each of them. Section 110 of the article on homicide, in 13 Cal. Jur. at p. 746, indicates that the construction placed on the statute by these early cases was accepted as the law of California until years after the provision was adopted in this state. That said construction carried out the true intent of the legislature is further indicated by the fact that no change was made in the wording of the provision in question after the Welch and French cases were decided.

■ In petitioner's brief, counsel contend that when the jury brought in the verdict recommending leniency, and the trial court then said to them, "This is not a verdict in accordance with the law. It is not determinative nor consistent," the court's language tended to confuse the jury and deter them from bringing in their true and intended verdict. There is no allegation to this effect either in the petition for the writ, or in petitioner's traverse and answer to the return. Notwithstanding this, however, the court would now grant the writ

if the record showed, as claimed by petitioner, that the jury was confused and misled, "gave up in despair" and, though not wishing to bring in a verdict requiring the death penalty, was compelled to do so by erroneous, contradictory, and unresponsive instructions; and this the court would do in any criminal case, whether capital or not.

■ In both verdicts the jury found defendant guilty of murder in the first degree. When they first retired for deliberation, they were instructed in clear and unmistakable language that if they returned such a verdict they had the discretion of fixing the penalty at life imprisonment, and a form of such verdict was handed them. At no time was any other instruction given or any remark made by the court, which in the slightest degree contradicted or was inconsistent with the aforesaid instruction. The trial court did not say that the verdict including the words "and recommend leniency" was not in accordance with the facts, or with the evidence; it did say that said verdict was not in accordance with the law, and that statement was correct. The court's further statement that the verdict was not determinative nor consistent was not erroneous, and any reasonable possibility of the jury's being confused was obviated by what immediately followed: "Mr. Collins: I feel that the Jury should be advised· that a recommendation of leniency is no part of a verdict and cannot be considered by your Honor. Court: That is the law. Mr. Bonner: That's right." When the trial court then directed the jury to retire for further deliberation, its action was not only proper and in accordance with law, but most favorable to petitioner in that it afforded the jury the opportunity, if such was its real intent, to fix the penalty at life imprisonment. No instruction or remark of the court complained of, either on the appeal or in this proceeding, was erroneous, contradictory, inconsistent, or confusing. Counsel for petitioner take the view that the jury were of the opinion that defendant was guilty of murder of the first degree,

but were not agreed upon the penalty. If such be the case, the jury rendered the only verdict it could lawfully return. There was no disagreement among court and respective counsel concerning any of the instructions now complained of. They all took the same view of the law, which was the correct view, and it was made plain to the jury that the only way of showing mercy was for the jury to exercise its discretion by fixing the penalty at life imprisonment. The trial transcript shows that from the time when the jury first came into court after retiring for deliberation, the court complied with and acceded to every request and suggestion made by petitioner's counsel.

The matters thus far considered involve questions of law only. We have now to consider petitioner's further contention that he was denied his constitutional right to the assistance of counsel in connection with his trial in the state district court. Before scrutinizing the sharply conflicting testimony given on this hearing in support of and in opposition to this contention, it is necessary that we summarize the principal facts and circumstances constituting and surrounding the commission of the crime.

Pursuant to appointment, petitioner and Frances Jones, wife of Harry Jones, met in front of a building on the corner of Sixth and Aultman streets in the city of Ely, between seven thirty and eight o'clock on the evening of February 15, 1940. Aultman street is the main business street of Ely, and runs easterly and westerly. Petitioner and Mrs. Jones became involved in an argument a few feet from the corner of the building, and as two men were passing them on the sidewalk, she called to one of them, "Buster, come here." Petitioner, in an ordinary tone of voice, said to this man, "keep going," or "You stay out of this," and drew a pistol from the right pocket of his overcoat. The two men proceeded west on Aultman street, and when they had reached a point about halfway across Sixth street petitioner, who had taken hold of the woman's right arm

with his left hand, fired four shots into her body while she was trying to get away from him. He then gave her a shove and she staggered toward and fell into Aultman street, where she died within about ten minutes.

Immediately after the shooting, petitioner walked fast around the corner of the building and then broke into a run as he proceeded north to an alley in the rear. He then turned east into the alley. A Mrs. Courtney ran after him along the side of the building and into the alley. He called her an offensive name and told her that if she did not stop he would kill her. About this time he ran into a dark place in the alley where there were some dogs which frightened Mrs. Courtney, who then went back after telling another man who had also been following petitioner, to remain while she called the police.

One witness testified that petitioner, on his way north between Aultman street and the alley, stopped a few seconds about twenty feet before reaching the alley, at which time the witness heard two clicks sounding like the opening and shutting of a revolver in ejecting empty cartridges. Later in the evening, along the west side of the building about twenty-five feet north from the Sixth and Aultman streets corner, officers found five discharged cartridges and one loaded cartridge. They also found a slug, or leaden pellet, in the gutter on Aultman street into which Mrs. Jones had fallen after being shot. On the following day the sheriff took from petitioner's suitcase an empty cartridge box, the label on which indicated 32.20 caliber, the same as that of the cartridges found on Sixth street the evening before. Near the spot where these cartridges were found, the officers also picked up a "Ten-High" whisky bottle which did not have the cork on; the cork was lying near the bottle. On the morning following the shooting, a bottle of "Old Taylor" whisky was found in Firemen's Hall in the city hall building, where petitioner was arrested.

So far as appears from the record, no one except petitioner knows where he was from the time he ran into

the dark place in the alley until a few minutes before seven o'clock the following morning, when Charles Bondurant, a county employee, walked into the fire truck room in the city hall building on his way to the washroom. As he rounded the front of the truck, he saw petitioner sitting in the fire chief's chair and asked him what he was doing there. Petitioner replied, "I am just resting," and asked Bondurant what he was doing, to which the latter replied, "I just came in to wash up," and then went on back to the washroom. When he came out of the washroom he asked petitioner how he was getting along, and he said all right. Petitioner asked whether Bondurant had heard about the shooting down town the night before, and was informed that the latter had just heard of it that morning when he came to breakfast. Petitioner said he had heard that a woman had been shot, and asked how she was. Bondurant told him he had heard she was dead. After hesitating a little while, petitioner said, "I am the guy that done the shooting." Bondurant asked petitioner what had gotten into him, and he replied that he didn't know. Bondurant then left and informed an officer that petitioner was in the firehouse. Officer Neill went to the city hall and "kind of rushed" into the truck room through a side door. Petitioner was sitting in the fire chief's chair. As Neill started toward him, petitioner pointed a pistol at him and said, "Don't move." Petitioner's hand was steady as he pointed the revolver. Neill backed out, went into the marshal's office and telephoned the sheriff. When the sheriff arrived, he and other officers called in to petitioner to come out and surrender, but he made no reply and did not come out. After some gas bombs had been procured, some of them were thrown into the truck room, and petitioner then went into the washroom and closed the door. A little later the big doors of the truck room were opened in order to ventilate it, and several rounds of shots were fired through the partition between the washroom of the city hall proper and that into which petitioner had gone. The purpose of this shooting was

to try to force petitioner out of the washroom. When the truck room had been cleared of some of the gas, several officers went in and called to petitioner to come out of the washroom. Petitioner did not come out at first. Officer Schloerb opened the door slightly, stuck his gun in through the opening and told petitioner to drop his gun. Petitioner was on his knees with his pistol in his right hand. He dropped the pistol, then Schloerb went in, stuck his gun "into petitioner's rib," brought him out and pushed him into the arms of the other officers. He then returned to the washroom and picked up petitioner's pistol. It was a 32.20 Spanish make revolver, and was loaded. Shortly after petitioner was arrested, Deputy Sheriff Aljets heard petitioner say that "in the evening earlier on the 15th of February" he had seven twenty dollar bills, six ten dollar bills, a five dollar bill and some silver in his pocket, and a watch. For the purpose of trying to locate where the money was, Mr. Aljets tried to get petitioner to recall his trip from the scene of the shooting to the city hall and fire department building; but petitioner never did give him the route he followed between these two places.

At the hearing in this court in the present proceeding, it was brought out that petitioner, in an affidavit made November 18, 1941, and presented to the board of pardons and parole commissioners, stated, among other things, that: "About the 12th of February, 1940 I had a date with Frances Jones to meet me at a certain place, and when I arrived at the place she was not there. When I next saw her, about the 13th of February 1940 I asked her why she had broken the date. She then proceeded to bawl me out and abuse me. After considerable talk we made a date for February 15, 1940. She was to meet me in front of the Collins Hotel at 8:00 P. M. on that night." (The Collins Hotel building, part of which was occupied by Sewell's Store, was the building at the corner of Sixth and Aultman streets in front of which the crime was committed.)

In his affidavit before the board of pardons and parole

commissioners petitioner said that when he left the Bank Club to meet Frances Jones on the evening of the shooting he did not go direct along Aultman street but went around the block another way, and did not know just how he got to the appointed place. On the hearing in this proceeding he testified: "A fellow by the name of Johnny Murphy told me I did walk around the other way. Why I did, I couldn't tell you myself."

Petitioner did not take the witness stand in the lower court. That he killed Frances Jones was proved by eye witnesses, and has never been denied by him; but no motive was shown at the trial. Upon this hearing, however, there was some evidence tending to show why the crime was committed. Petitioner gave the following testimony relating to conversation between Frances and him just before the shooting: ·

"Q. Did you have some conversation with Frances Jones when you met her in front of the Collins Hotel? A. Very little.

"Q. What did you say to her? A. If I could recall the exact words I would tell you, but I don't know.

"Q. Can you recall any of the conversation, at this time? A. None.

"Q. None? A. Except that conversation passed, and I couldn't tell you what was said. But little was said. She was going to a car raffle, I believe; I am not even positive of that.

"Q. And what did you say then? A. Well, I don't know just exactly what I said.

"Q. Well, did you say anything? A. Yes. I said something about breaking dates, and I believe I did say: 'That is no excuse, to go some place'; I am not even positive of that.

"Q. Did you say to her at that meeting at that time and that place that she had been lying too much to you? A. I don't think the conversation went that far.

"Q. I will read to you, Mr. Kramer, from the same affidavit, to which you said your signature is affixed:

'As near as I can recall, because it has always been blurred in my mind, I said to Frances Jones: "Where are you going?" She replied: "I am going to a raffle." I then said: "Never mind the raffle. You are going to stay right here. You have been lying too much to me, and I don't like it." ' Did you say those words to Frances Jones at that time and place? A. I wouldn't say yes or no; perhaps I did.

"Q. Will you say now that your statement in this affidavit is not correct? A. So far it is, I guess.

"Q. The statement in the affidavit is true, is it? A. I presume so, yes."

James M. Collins, counsel for petitioner at the trial in the court below, was asked, in this proceeding, by counsel for petitioner: "What defense did you want to present on behalf of Mr. Kramer." He replied as follows: "Mr. Kramer would testify, he told me, that he was madly in love with Frances; that he had become very jealous of other men; that when he went down to meet her that night—that he had an appointment to meet her, and I asked him where, I remember distinctly, and he said that he was to meet her in one of those saloons there in that block, either the Monte Carlo or the La Paloma; that he remembered going down from the direction of the Scott house, which is northerly and westerly from the corner on which the shooting was alleged to have taken place; that when he reached the corner he saw Frances' car parked there; that when he reached the corner he had a recollection that he grasped Frances' hand, and she said to him: 'Let go.'; that he replied: 'No, I am going to hold this hand now, and you can keep the other one for the fellow you were out with Sunday night.' And he said then he shot. And after that, he told me, he did not know what had happened on that night. But when I had gotten the information from Panguingui Red, he told me he was in error when he told me he didn't know what happened the rest of that night. But I asked him if he would testify that

he was very much in love with Frances, and all that sort of business, and he said 'Yes.' And that was to be the general story, as he told it to me."

Petitioner's contention that he was denied his constitutional right to counsel in the court below is based upon the alleged facts that the attorney appointed to defend him was negligent, careless, incompetent and unmindful of his duties. The particulars in which he is alleged to have been so are set forth in detail in the petition, and also appear in the summary of testimony given at some length later in this opinion. It suffices here to say that petitioner's chief causes of complaint arise out of counsel's alleged failure: to confer with petitioner as frequently or as much as he was in duty bound to do, before as well as during the trial; to contact and call as witnesses persons who would have proved that at the time of the shooting petitioner was so intoxicated that he did not know the difference between right and wrong and was incapable of forming any premeditated intention to kill Frances Jones; to present any defense at the trial; to take any real interest in petitioner's case; and to move for a new trial.

The alternative writ in this proceeding was made returnable December 3, 1941. On that day petitioner moved for a continuance, the motion naming nine witnesses he desired to call. The continuance was granted, and as all said witnesses reside at Ely or Kimberly, both more than three hundred miles from Carson City where this court sits, it was ordered, with the consent of the parties, that their testimony be taken at Ely before Honorable James Dysart, judge of the Fourth judicial district court, as referee. The order further provided for the calling by petitioner of one other named witness, also four more provided it should appear that their names had been given Mr. Collins by petitioner before the trial started. Petitioner called only six witnesses to testify before the referee, notwithstanding all the others were available, and the referee did not deny petitioner the right to have the testimony of any of the

other eight. The order also provided that respondent would be permitted to offer rebuttal testimony before the referee, and three witnesses gave such testimony. After the testimony of said nine witnesses had been certified to this court, petitioner, attorney Collins, and deputy sheriff Russell gave their testimony before this court in its courtroom at Carson City. It is necessary that we give the substance of the pertinent testimony in this proceeding taken before the referee and in this court.

O. A. Wilson, mine foreman at Kimberly, about nine or ten miles from Ely, called by petitioner, testified: That after petitioner left his employment at Kimberly in the fall of 1939, witness saw him occasionally in Ely, usually at the Capitol Club and the Bank Club; that witness would not testifiy that on such occasions he saw petitioner drinking at the bar, because he didn't recall any instance; that witness and petitioner had had a drink together at the bar of the Bank Club; that petitioner drank on different occasions; that on such occasions, when they talked together, he smelled intoxicating liquor on petitioner's breath, but he supposed there were times when they talked together that he did not notice intoxicating liquor on petitioner's breath; that attorney Collins never talked to him about acting as a witness for petitioner, never subpenaed him as a witness, and never discussed petitioner's drinking with witness.

Ben Affleck, of Kimberly, called by petitioner, testified: That he was employed at the Consolidated Copper Mines at Kimberly, and that petitioner had also been employed there; that since petitioner left Kimberly in October 1939, witness had seen him at various times on the street at Ely, and had seen him several times at the Bank Club bar; that he had seen him drinking intoxicating liquor, but could not say that he had had a chance to smell his breath; that attorney Collins had come to see him and ask him to testify as a witness for petitioner, but had never sent him a subpena.

Mrs. Barbara Wilson, of Ely, called by petitioner, testified: That she was employed as a waitress in the cocktail lounge of the Bank Club bar and cabaret in Ely; that in the fall of 1939 petitioner was in the Bank Club nearly every day; that he drank beer and whisky; that she frequently served him drinks; that on some days petitioner would stay in the Bank Club just a few minutes, and at other times, for hours, that she didn't remember when petitioner started to drink, but knew he did drink quite a bit; that she saw him in there practically every day drinking; that petitioner was always a perfect gentleman when he was drinking; that she never saw him "out of line" at any time; that she couldn't remember that she had ever seen him staggering; that he acted just as a normal person would, and "better than the most of them," "better than the average normal person"; that attorney Collins never requested her to testify as a witness for petitioner, nor did he ever subpena her as such witness; that Mr. Collins never discussed with her the subject of petitioner's drinking; that she and Mr. Collins had talked about the case quite a bit, and that she had conversations with him relating to petitioner.

H. A. Reinhart, of Ely, called by petitioner, testified: That he was employed as a bartender at the Bank Club; that from about the middle of October 1939 until February 15, 1940, he had served petitioner a few drinks of liquor; that he had not served petitioner drinks right up until February 15—"it was just in a periodical way he would come in there occasionally and then he wouldn't see. him for awhile"; that witness's hours of employment were from midnight until eight o'clock in the morning; that most of the liquor he served petitioner was either bottled Budweiser or Blue Ribbon bottled beer; that petitioner never drank anything besides beer on witness's shift; that when petitioner drank this beer he acted just as normal as anybody else; that in witness's presence petitioner acted at all times as a gentleman, just like an ordinary person; that he did not know

whether he served petitioner any drinks on February 15, 1940; that attorney Collins had never requested him to testify as a witness on behalf of petitioner, and had never served him with a subpena.

Harold Frederick Able, of Ely, called by petitioner, testified: That he was employed as a bartender at the cocktail bar in the Bank Club; that from the middle of October 1939 until about the middle of February 1940, petitioner was in and out quite frequently; that he served him drinks, most of the time beer and a little whisky; that he saw petitioner in the cocktail bar on February 15, 1940, a couple of hours or so before the shooting; that petitioner had a few drinks; that when witness saw petitioner the last time before the shooting, he couldn't exactly say what the latter was drinking; that he drank a lot of beer, but he couldn't say whether he drank more beer or more whisky; that when petitioner drank he acted all right, always acted a gentleman, never "out of line" at any time; that witness had never seen petitioner staggering, and had never seen him drunk; that attorney Collins had never asked witness to testify for petitioner, and had never served him with a subpena; that witness had talked about the case several times with Mr. Collins.

Frank Simpson, of Ely, called by petitioner, testified: That he was a coowner of and working in the Bank Club; that from the middle of October 1939 until and including February 15, 1940, he saw petitioner at the Bank Club bar most every day and most every night; that petitioner was drinking along a little every night, had drinks every night, around there every night; that he was also around there in the afternoons sometimes; that he drank beer and Old Taylor highballs; that he saw petitioner in the Bank Club at approximately 6:00 or 6:30 p. m. on February 15, 1940, first at the back bar and then at the front bar; that petitioner was drinking, and shortly after that somebody came in and said that Frances Jones was killed; that while petitioner was in the Bank Club before the shooting took

place, he asked witness to have a drink and petitioner had a highball as witness came along at the front bar; that when witness saw petitioner drinking the last time before the shooting, he acted all right as usual; that there was nothing out of the ordinary in his actions; that he always acted the perfect gentleman; that he was not staggering around any, and that witness did not notice that petitioner looked any different when he was in the Bank Club last before the shooting than on any other occasion when he had seen him in there; that witness imagined petitioner acted the same as counsel or witness would, just normal, the same as usual; that witness was unable to state how many drinks petitioner had had that afternoon, but did see him drinking at both bars at six o'clock in the evening, or thereafter; that he had never seen petitioner "out of line" or staggering; that attorney Collins had never asked witness to testify at petitioner's trial, nor did he ever send him a subpena; that Mr. Collins had mentioned the Kramer case to witness several times, not much of a discussion, but he mentioned the trial.

William B. Neill, a deputy sheriff of White Pine County, called by respondent, testified: That when he walked into the fire station in the city hall around seven o'clock on the morning following the shooting, he saw petitioner sitting in a chair with a gun in his right hand, pointed at witness; that he told petitioner he had come after him, and petitioner told witness to stand still and not move; that the gun wasn't shaking, and petitioner was holding it steady; that from petitioner's appearance and demeanor witness would say that he had not been drinking; that he did not smell petitioner's breath nor give him any examination to determine whether he had been drinking; that he did not know whether petitioner was drunk or drinking the night before when the shooting occurred.

Mary Roache, called by respondent, testified: That on February 15, 1940, she was employed as a waitress serving food at the tables in the Bank Club cafe; that

the last time she saw petitioner eating there was around eight o'clock in the evening of February 15, 1940; that it was the dinner hour; that petitioner was quite angry because toast did not come with his order of chicken; that otherwise he was quite natural, quite normal; that as far as she knew, he acted the same as he always had; that he had been eating at the cafe for two or three months, and on the evening of February 15, 1940, acted just about as he always did on other occasions; that she did not see anything wrong with him; that he was always very cranky about his food; that to her knowledge she wouldn't say that petitioner appeared to be at all intoxicated; that he didn't look intoxicated; that he wasn't staggering noticeably, and that his speech was not impaired; that he appeared normal to witness; that it was less than an hour from the time petitioner had his dinner until witness heard of the shooting.

Dorothy Vuksan, called by respondent, testified: That she was the owner of the Bank Club cafe, her husband being the manager; that she was working there February 15, 1940; that she did not know petitioner until the evening of that day; that she saw him in the cafe during the dinner hour; that it was somewhere within the dinner hour, 5:00 to 8:00, that petitioner had his dinner in the cafe that evening, and made a very unpleasant complaint about the meal; that she saw nothing wrong with petitioner, only that he was cranky, and she didn't like the way he spoke to the waitress; that to her knowledge he appeared to be as a normal person; that she had very often seen intoxicated people in the cafe and was more or less familiar with people who are intoxicated; that she would say, "so far as my knowledge," that petitioner was not intoxicated at the time in question; that he could have been intoxicated, but it wasn't noticeable; that he looked normal to witness, otherwise he would not have been served; that they refused service to intoxicated people in the cafe, and that so far as she knew, petitioner was not intoxicated; that after petitioner complained about the meal, witness

told the waitress not to pay any attention to chronic kickers, and that petitioner finished his meal and went away; that witness did not go up and smell petitioner's breath to see whether he was intoxicated; that a person could be intoxicated without staggering; that petitioner might have been intoxicated, and witness not have known it; that witness couldn't say petitioner was not intoxicated, and couldn't say that he was.

Petitioner testified: That he never knew he could ask the trial court to appoint some other lawyer than Mr. Collins to represent him; that from the time counsel was appointed he came to see petitioner six times; that on one of these visits petitioner was asleep and was not awakened, the other visits being on February 20, 21 and 22 and March 18 and 19 (1940); that on the first four visits counsel wanted to know why petitioner shot Frances; that he said nothing further about petitioner's defense except that he wanted to know whether petitioner could procure money with which to hire experts to testify regarding his mental condition; that thereafter petitioner was promised $250, but the party who was to put up the money said, "I am not going to give it to Mr. Collins"; that on the March 18 visit counsel and petitioner went over the names of the venire of the jury, and had no other conversation; that on the opening day of the trial, March 19th, petitioner attempted to give counsel a list of witnesses he had prepared, whose testimony petitioner considered essential to his defense, Vincent Andrews, Mike Clifford, Henry Jones, Roy Dano, Lester Hardy, Mrs. Lester Hardy, Harold Able, Heine Reinhart, Weiners Martella, Mrs. Barbara Wilson, Bennie Affleck, Joe McClellan, O. A. Wilson, and Frank Simpson; that counsel looked the list over once and found that out of the fourteen names there was only one he didn't know; that counsel wanted to know who that party was, and laid down the list on the table, that was the last petitioner heard of it; that petitioner had asked counsel to take the list and interview the witnesses before the trial, but that counsel didn't "show

up"; that when petitioner gave the list of witnesses to counsel on the opening day of the trial, the latter said, "What the h— do these people know about your case?"; that none of said fourteen witnesses was called to testify for petitioner at the trial; that Mr. Collins called but one witness, deputy sheriff Aljets, to testify for the defense, and this was done without consulting petitioner; that during the course of the trial counsel did not consult with petitioner at all regarding his defense; that after the state rested its case, counsel talked to petitioner in a private room about the latter's taking the witness stand; that counsel wanted him to take the stand and tell about where he met Frances and all the intimate details; that petitioner refused to take the stand unless counsel called witnesses to corroborate what he would say; that there were also other reasons, private, why petitioner did not wish to take the stand, namely, that it would have brought people into notoriety that were married and had children, and there was no necessity of doing that; that petitioner didn't want the name of Frances' sister harmed by his testimony; that after the jury had brought in its verdict, counsel never came into the jail or any other place to consult with petitioner regarding a motion for new trial; that petitioner's education was just common school, eighth grade; that prior to March 19, 1940, petitioner had had no experience in courts and legal procedure; that from about October 1939 until the shooting of Frances Jones, petitioner was unemployed and spent his time "mostly drinking, I believe"; that he guessed he drank every day and every evening; that he drank considerably; that he frequently bought a quart of whisky and drank it in his room at night; that his drinking continued right up to February 15, 1940, increasing as time went on; that on February 14, 1940, he was fairly well drunk and had a quart bottle with him when he went home; that he believes he drank that quart of whisky that night; that on the morning of February 15 he got up about six or seven o'clock, got a pint bottle of whisky

and drank some of it; that in the afternoon of February 15 he was mostly around the Bank Club bar and had quite a few drinks, "whisky, I guess"; that whisky is all he drank, practically, that afternoon; that he stayed at the Bank Club until late in the evening and doesn't know exactly where he went after leaving the Bank Club "until I came to myself in front of the Collins Hotel" (the place where the shooting took place) ; that before leaving the Bank Club bar he had had many drinks of intoxicating liquor; that all his drinking from October 1939 to the time of the shooting was voluntary; that he drank quite a bit of Blue Ribbon beer, but drank more whisky than beer; that in the daytime he would drink a lot of beer; that during his trial he did not inform the court that he wanted any witnesses called, or that he had not had a fair trial; that after the trial and before petitioner was taken to the state prison, he told some half dozen people that his attorney was incompetent; that Mr. Collins never gave him a chance to tell him what the witnesses would testify to; that the only times he had been in court prior to his trial were for drinking and fighting, but never in the last thirty years that he could remember; that he didn't know much of anything on February 15, 1940, by reason of his drinking; that he presumed he knew that he came in front of the Collins Hotel when he met Frances; that he believed he had an appointment with some one at that place, but doesn't remember at what time; that he presumes he kept the appointment, that he must have, and that it was some time in the evening.

Mrs. Christine M. Russell, a deputy sheriff of White Pine County, testified: That she took care of all the book work and acted as matron in the sheriff's office; that fifteen minutes after Mr. Collins was appointed to defend petitioner, he visited him in the jail; that thereafter he never let more than two or three days lapse without calling on petitioner; that this continued from February 20 to March 19, 1940; that on one occasion

after counsel had come from visiting petitioner, witness said to the former "How is everything?" and he replied, "Kramer will talk on every subject but the one I am most interested in, the shooting"; that on one occasion counsel, after visiting petitioner, asked witness if she would take up paper and a pencil to petitioner as he was going to make some notes for him; that she took the paper and pencil to petitioner; that petitioner never at any time made a statement to her or in her presence that he objected to Mr. Collins being his attorney; that she would say Mr. Collins called on petitioner at least twelve times from the time of the arraignment until the trial; that there were never more than two days elapsed between counsel's visits to petitioner; that she couldn't say that counsel came to see petitioner after the jury brought in its verdict.

James M. Collins, attorney appointed by the trial court to defend petitioner, testified: That he had resided in Ely about thirty - four years; that since 1928 he had been an attorney at law, practicing in Ely; that he thought he had defended more criminal cases perhaps than any other lawyer in Ely, being paid sometimes by the client and sometimes by the county; that upon being appointed to defend petitioner, the first thing he did was to go to the sheriff's office and talk with petitioner; that the next time he visited petitioner was either the following day or the day following that; that he went to see petitioner perhaps five times during the first week, daily, he might say; that after the first week he didn't think three successive days ever passed that he didn't visit petitioner, and this continued until the time of the trial; that to the best of his recollection he did not visit petitioner on the morning when the trial commenced, but spent, as he recalled, the greater part of the Sunday afternoon preceding the trial with petitioner at the jail, and on that occasion made notes of what his testimony would be at the trial; that the purpose of his visits to petitioner was to converse

with him in preparation for the approaching trial and to obtain from him, if possible, all the facts and circumstances surrounding the case, and particularly the names of any witnesses that he might think would be of benefit to him; that he had difficulty from the beginning in getting petitioner to discuss the case, and it took him about a week, he thought, before he could get petitioner to talk on the subject of the case; that soon after his appointment he said to petitioner, "Jack, there are two in whom we must all have confidence, our doctor and our lawyer"; that he explained to petitioner the reasons for this, and then said, "Now I want you to tell me all about this affair"; that petitioner replied, "That is something I will never tell anybody"; that a week or ten days after the arraignment, he asked petitioner for a list of witnesses that would be pertinent to his defense, and a day or two afterwards petitioner handed him a list written on a piece of wrapping paper from a package; that after looking over the list, witness said, "Jack, what do these fellows know about the case?", and petitioner replied, as near as witness could repeat his language, "Nothing at all. They all knew that woman"; that witness kept said list of witnesses in his pocket for a.day or two and saw the different witnesses; that later, when talking to petitioner, witness took the list from his pocket and told him that all of the witnesses on that list were hostile to petitioner; that they would not testify positively as to the woman's moral character, and that in his judgment, if they did, their testimony would not be admissible, and that if witness were to call them to the stand and ask them questions they would testify "just the opposite"; that petitioner then said, "You can call them and make them testify, can't you?", and witness replied, "Yes, Jack; but when their answers are detrimental to you the damage is done"; that there were only six names on the list which had been handed witness by petitioner, namely, Bert Riddick, Vincent Andrews, Weiners Martella, Roy Dano, Henry Jones

and Mickey Clifford; that he talked with all six witnesses, but did not ask any of them to testify because they were so hostile that he knew their testimony would be harmful rather than helpful to petitioner; that he knew it would be obnoxious to these witnesses to testify as to the character of Frances Jones, and that they told him if he called them for that purpose they would "make a monkey out of him"; that he discussed petitioner's drinking with said witnesses, except Dano and Jones; that these two made it very plain to him as to just how they felt and what they would testify to, and he knew from what they told him that their testimony would be adverse; that in his conversations with said six witnesses, not one of them told witness that he would testify that petitioner was drunk on the 15th of February 1940; that petitioner never mentioned to witness the names of Lester Hardy, Mrs. Lester Hardy, Harold Able, Henry Reinhart, Barbara Wilson or Ben Affleck; that with regard to Joe McClellan, witness thought he was a man known as Panguingui Red or Tonopah Red, but was told afterwards he was mistaken, and perhaps he was; that he talked to the man he thought was Joe McClellan many times about the Kramer case, but he never gave witness any informatoin which, in his opinion, was valuable to petitioner; that with respect to O. A. Wilson, witness thought he was an ex-husband of Barbara Wilson; that petitioner did not give witness the name of O. A. Wilson as a witness, nor that of Frank Simpson; that witness talked to Simpson, however, but obtained no information from him that would have been of vålue to petitioner; that petitioner did not give witness a list of witnesses on March 18 or 19, 1940, nor at any other time, except as already stated; that nothing was ever said between petitioner and witness in regard to securing money for expert witnesses; that the only conversation about money was on one occasion when petitioner said to witness "Now, no matter what happens, you get paid any way, don't you?", to which witness replied, "Jack, the sum of $100 is allowable, the

maximum in cases of this character, and I assume the court will allow me that much in this case. But that makes absolutely no difference; it wouldn't make any difference to me whether I got $100 or a million, I will do my best"; that petitioner then said, "Don't you bother yourself about what should be done in this case; you just go ahead and do as you see fit"; that between two and three weeks prior to the trial witness suggested to petitioner that he take the witness stand at the trial; that on the occasions of his visits to the jail witness talked to petitioner as to what had taken place and what he would testify to, and on the 17th day of March 1940 witness talked to petitioner at greater length in regard to what his testimony would be; that some time before March 17 witness told petitioner of the attitude of the witnesses and what he thought the result would be that it would not help him, and petitioner then said, "All right, let it go," and never spoke of the witnesses thereafter; that it was witness's understanding on the Sunday next before the trial that petitioner would be a witness in his own behalf, and that remained his understanding until the morning of the last day of the trial; that on that morning he went early to the jail to see petitioner, because it was witness's intention to put him on the stand immediately after the state had rested its case; that when witness asked petitioner whether he rested all right the night before, the latter replied, "Yes, and I made up my mind what I am going to do. I am not going on the stand, and I am not going to let you say a word either"; that witness remained with petitioner as long as he could, trying to persuade him to change his mind and telling him what in witness's opinion it would mean to petitioner not to take the stand, but that no matter what he said to petitioner the latter said, "I told you what I am going to do, and that is that"; that later in the morning witness secured a short recess, took petitioner to the county commissioner's room and again made what he thinks was the most ardent appeal he ever made to any one, for him to take the stand, and

he steadfastly refused, and told witness he would not do so; that petitioner did not tell him his reasons for not wanting to testify; that when, previous to the trial, witness, referring to the list of witnesses given him by petitioner, said, "What do any of these people know about this case?", and petitioner replied, "Nothing at all, but they knew that woman," it was witness's understanding that petitioner wanted them to testify as to Frances Jones' character, and witness told petitioner they would not do so; that then petitioner said, "Well, why should I testify to a thing when they know as much about it as I do?"; that shortly after the arraignment, petitioner informed witness that he did not wish to take the stand and testify about Frances Jones because it might injure the reputation of her married sister; that petitioner did not say to witness that he did not want to go on the stand and testify about Frances Jones unless the witnesses petitioner desired called would be used to corroborate his testimony; that witness made every effort he could to find witnesses and evidence to present in behalf of petitioner; that witness did not know at the time of the trial and did not know now of any matter which he could have submitted in behalf of petitioner that would have been beneficial to his defense, except the testimony of petitioner himself, which he said he would give, but which he thereafter absolutely refused to give; that witness never contacted O. A. Wilson, and did not know him; that he had the wrong man in mind, and that his name was not given him by petitioner; that petitioner did not give Mr. Affleck's name to witness but that, knowing Affleck worked at Kimberly, witness tried to elicit from him something that might help petitioner, particularly with reference to his drinking, but was unable to obtain anything from him that was beneficial; that witness had conversed with Barbara Wilson many times, because she was a waitress in the Bank Club, and witness knew that she and her husband had gone out to dinner with petitioner and Babe London; that witness talked to Mrs. Wilson

particularly, but she told him that while she knew petitioner to take a drink or two occasionally, he was always a gentleman, and that on occasions when they went out to dinner, she never saw him drunk, he would have a cordial or two, but that is all; that witness talked with Mr. Reinhart on different occasions and asked him if he had ever seen Jack under the influence of liquor, to which he replied, he had not; that the same was true of Harold Able, with whom witness talked many, many times; that witness talked with Mr. Simpson probably five or six times before the trial, and on one occasion Simpson asked him if he would like to get some information regarding a certain point, to which witness replied he certainly would; that Simpson then said, "Don't mention me in the matter, but ask Panguingui Red."; that witness did ask Panguingui Red, but the information the latter gave him was entirely adverse to that which petitioner had given him on the same subject; that for a period of about sixty days before the shooting witness had seen petitioner quite frequently in the Bank Club, usually in the lounge, and had seen him drink liquor, but had never seen him drunk; that he had seen petitioner take a drink of beer and wouldn't say that he did or did not take a drink of whisky, but he knew that he was what witness would call a beer drinker and what he would call a moderate drinker; that he never saw petitioner in a condition such that he would be able to testify that he had taken a drink if he hadn't seen him take it; and this was about as strong testimony as witness could obtain from any one else; that in an affidavit dated November 28, 1941, and filed with the board of pardons and parole commissioners, witness stated, "I knew that Mr. Kramer had been drinking steadily for a period of days before Frances Jones was shot, and that was to be a part of his testimony which I thought would be a great benefit to him if he would take the stand"; that witness had seen petitioner drinking, but never to excess; that he knew he had been drinking for a period of days prior to the

shooting, just the same as he had seen many other men drink every day, probably two or three times; that petitioner had told witness about things that took place in saloons other than the Bank Club, principally the La Paloma and the Monte Carlo, and witness himself knew that petitioner had at times gone into the Capitol Club; that witness visited those places and talked with bartenders and others in an effort to get some information regarding petitioner's drinking there; that witness had talked to Barbara Wilson, Mr. Reinhart, Mr. Able and Mr. Simpson previous to the trial and knew what they would testify to, but did not subpena them because they would hurt petitioner rather than help him; that it was not on March 17, 1940, when witness had a long talk with petitioner at the jail, that the latter told him he would not take the witness stand; that witness visited petitioner in his cell on that day for the purpose of taking notes of the testimony petitioner would give at the trial; that witness did not call any witnesses from the Bank Club bar to testify about petitioner's being in there drinking in the afternoon and evening before the shooting occurred, because he could get no such testimony; that the only testimony he could ever get from any of them was that they had never seen Mr. Kramer other than in a normal condition; that he thought they would do more harm than good; that the fact that the jury first brought in a verdict recommending leniency was not considered by witness a good ground upon which to base a motion for a new trial; that he did not think the jury might have been confused on the charges given by the court and did not feel that a motion for new trial should be made for that reason; that he did not feel that there were grounds on which he could, in good conscience, make a motion for new trial; that under all the circumstances, he did not think that his appointment as petitioner's counsel covered the necessary steps in making a motion for new trial, and that he thought he had performed his full duty to petitioner; that it did not occur to witness to have Mr.

Affleck testify as a character witness, because after a short talk with him he was convinced he could not obtain any evidence from Mr. Affleck that would be of any benefit whatsoever; that witness had had rather extensive experience in practicing criminal law at Ely; that he had defended defendants in many important criminal cases, many more than any other practicing lawyer in Ely; that he did not think he knew of more than three murder cases in Ely since he had been practicing, and that he had defended all of them; that notwithstanding the long time petitioner worked at Kimberly and his wide acquaintance there, witness did not feel he could obtain testimony there favorable to witness, because the people from Kimberly that witness talked with were all very hostile to petitioner; that witness did not go to Kimberly to talk to people there, because he could talk to them as easily at Ely, as they came there when off shift; that many of the men at Kimberly would not eat at the same table with petitioner, and were very hostile; that witness thought it very ridiculous to think that if one or two character witnesses had been produced the jury would have recommended life imprisonment; that witness was left in a position of not having any evidence by reason of petitioner's refusal to take the witness stand after promising to testify; that it is not true that petitioner refused to take the stand because witness would not get any witnesses to corroborate him; that witness prepared instructions and found them either covered or given by the judge who did not in any way refuse to instruct the jury on the points he requested instructions on, and the only instruction he prepared which was not covered was the one referring to the defendant taking the stand; that he agreed that the action of the jury was inexplicable—"I think you would make the same statement, Mr. Custer, when they came in with a verdict of first degree murder recommending leniency. I knew that that verdict meant the death sentence for Mr. Kramer, and I certainly felt that if they wanted to give him leniency,

after the judge gave them another chance they would do so, by fixing the life penalty instead of the death penalty. Their action was certainly inexplicable to me."; that as to preparing a trial brief, he did what he felt he was required to do to properly present the case; that he didn't think he had the trial brief in this case, because after a case is concluded he does not keep matters he doesn't think will be of benefit thereafter; that he couldn't say whether there was a copy of instructions in his office or not; that deputy sheriff Aljets was the only witness for the defense; that witness doesn't think he consulted with petitioner before calling Mr. Aljets; that the reason for calling Mr. Aljets was that the latter had told him something about a whisky bottle and when that bottle was not produced he considered it good practice to have him produce it, and called him for that purpose; that witness had given this case more time and attention than any other criminal case he ever had, and was never more interested in the successful preparation and presentation of any criminal case he ever had than he was in this one; that notwithstanding this, he was unable to procure a single witness to testify on behalf of the petitioner; that if, after the verdict of the jury, he had at any time had any idea that the case had not been properly tried or that there might be some evidence that could be secured for petitioner, he would in that event undoubtedly have moved for a new trial; that while the first verdict of the jury was inexplicable, there was no way in which witness could have avoided it; that he was not in doubt as to whether the jury, because of its long confinement, had perhaps been confused regarding the instructions; that he didn't think they were confused; that he thought they had another reason for remaining out so long.

 To meet the requirements of due process, assistance of counsel must be effective. Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 A. L. R. 527; 11 Am. Jur. 1107, n. 4. The attorney appointed to defend accused should be competent. 23

C. J. S., Criminal Law, sec. 982, p. 325, note 61. The right to counsel is not formal, but substantial. Johnson v. United States, 71 App. D. C. 400, 110 F. (2d) 562. Accused is entitled to have counsel before as well as at the trial, and at every stage of the proceedings. Harris v. State, 203 Ind. 505, 181 N. E. 33; 23 C. J. S., Criminal Law, sec. 979, p. 319, note 10. The conduct of the defense should be zealous and active, not merely pro forma. From the time of the arraignment until the beginning of the trial, when consultation, investigation, and preparation are vitally important, accused has the right to the aid of counsel in a real sense. Powell v. Alabama, supra; Avery v. State of Alabama, 308 U. S. 444, 60 S. Ct. 321, 84 L. Ed. 377; 23 C. J. S., Criminal Law, sec. 979, p. 319, note 12. While the burden is on petitioner to show that he was denied his constitutional right to the assistance of counsel, the record must be scrupulously reviewed where such denial is asserted. Avery v. State of Alabama, supra.

 A judgment in a criminal case will not be set aside on account of the incompetency or neglect of counsel, unless it is so great that the defendant is prejudiced and thereby deprived of a fair trial. State v. Jukich, 49 Nev. 217, 242 P. 590; 23 C. J. S., Criminal Law, sec. 1443; 24 C. J. S., Criminal Law, sec. 1948, p. 1112.

 Applying the law to the testimony taken on this hearing, the court is satisfied that petitioner was not denied his constitutional right to the assistance of counsel in the court below. The appointment of attorney Collins was in all respects regular. Petitioner was given six days to plead to the information, and it was almost a month from the arraignment until the trial. There was ample time for conference, investigation, and preparation. Mr. Collins's experience and success in defending persons accused of crime, up to the time he was appointed to defend prisoner, have not been challenged, In selecting the jury, applying to the court to have the witnesses put under the rule, cross-examining witnesses, objecting to testimony offered by the state, resisting

objections made by the state to testimony offered in behalf of petitioner, succeeding in excluding exhibits offered against the defense and procuring admission in evidence of exhibits favorable to petitioner, in guarding the interests of petitioner with reference to instructions to the jury, and in all other matters during the course of the trial, counsel acted with at least ordinary skill and with a careful regard for the interests of his client.

Petitioner's testimony that his attorney failed to confer with him before the trial as much as he should have is wholly uncorroborated, while that of the attorney to the effect that he had numerous conferences with petitioner is satisfactorily corroborated by the testimony of deputy sheriff Russell.

Petitioner's testimony that his attorney failed to cooperate with him is not supported by the evidence on this hearing; on the contrary, the testimony indicates that petitioner failed to properly cooperate with and confide in counsel. The most conspicuous example of such failure was petitioner's admitted refusal to heed counsel's urgent advice that he take the witness stand in his own defense.

By its ruling in this proceeding, the court opened the doors wide in order to afford petitioner the opportunity to show that counsel could have offered testimony to support his contention that he was so intoxicated at the time of the shooting that he did not know what he was doing, and was incapable of forming the deliberate intent to commit first degree murder. He was given permission to produce testimony covering the period from the middle of October 1939 to the time of the shooting on the evening of February 15, 1940. Notwithstanding this, and the fact that during all that period he claims to have spent a large part of his time in the Bank Club and other resorts, he was unable to produce a single witness to testify that he was intoxicated on February 15, 1940, or at any time since the middle of October 1939. It is significant that petitioner, who told of purchasing bottles of whisky and drinking them at night in

his room, has not only failed to produce a single witness to testify from whom, or at what place or places he purchased any bottled whisky, but has not even named any person from whom or any place where he purchased such bottled liquor. Furthermore, the sheriff testified that the officers had tried, without success, to find where petitioner had purchased such liquor. Petitioner on this hearing emphasized the extent of his drinking on the night of February 14 and on the following day up to the time of the shooting. He says he purchased a quart bottle of whisky on the evening of February 14, and drank it that night, and purchased a pint bottle of whisky on the morning on the 15th, but he neither tells us from whom or where he purchased these bottles or either of them, nor produces any witnesses to support his testimony. It thus appears that while petitioner unquestionably drank to some extent during the period in question, his testimony relating to his intoxication remains without any substantial corroboration whatsoever.

In cross-examining attorney Collins on this hearing, counsel asked whether there might not have been a different verdict had character witnesses testified for petitioner at the trial. Nowhere in petitioner's pleadings is anything said regarding counsel's failure to produce character witnesses. Aside from that, however, petitioner has not offered any witnesses to say that if called they would have testified that his reputation for peaceableness was good. Mr. Collins testified that he was unable to procure any character witnesses, that every person he talked with from Kimberly, where petitioner worked so many years, was hostile, and that many of the men petitioner had worked with there would not eat at the same table with him.

Attorney Collins testified further that after talking with various persons for the purpose of procuring witnesses for the defense, he conferred with petitioner regarding their attitude and what they would testify to

if called, and petitioner then agreed that none of them should be called.

During the trial, and prior thereto, petitioner made no complaint about his attorney. He said nothing to the court, and made no effort to communicate with the judge. He is neither illiterate, young, nor ignorant, as were the defendants in the Scottsboro cases (Powell v. State, supra). It was a long time after the verdict before petitioner complained to any court about not having had the effective aid of counsel at and before the trial.

There was not, in this case, any arbitrary or hostile conduct on the part of the trial judge, any misconduct of the prosecuting attorney, any mob spirit or undue haste. Counsel was never denied the right to confer with petitioner, and no officer mistreated him or refused to deliver any messages from him to the trial judge or any one else.

The trial judge was not aware that petitioner was in any way dissatisfied with his attorney, and was given no opportunity to inquire into any claim on the part of petitioner that he was not properly represented and was not being fairly tried. Attorney Collins testified that petitioner made no complaint to him regarding his services either before or during the trial.

It is contended that the attorney's failure to move for a new trial shows that petitioner did not have the efficient aid of competent counsel. Mr. Collins testified that he had not discovered any new evidence, and that he knew of no ground upon which, in good conscience, he could have moved for a new trial. The grounds for a motion for new trial suggested by counsel for petitioner on this hearing would have proved unavailing. Another attorney might have moved for a new trial; but the fact that attorney Collins did not was insufficient, under the circumstances, to constitute denial of due process. Fambles v. State, 97 Ga. 625, 25 S. E. 365, 366.

The preparation for and defense of this case was a difficult assignment. There was no question that petitioner did the killing, and no pretense of any legal justification for his act. A long time after his conviction, petitioner for the first time puts forward the contention that when he shot Frances Jones he was so intoxicated that he didn't know the difference between right and wrong, and couldn't form any premeditated intention to kill. But the record shows that he knew enough: to go around the block instead of directly down the main street to keep his appointment with Frances Jones; to take with him a loaded revolver concealed in his overcoat pocket; to quarrel with Mrs. Jones about her failing to keep appointments with him and keeping appointments with other men; to tell a man to whom Mrs. Jones had called for help to keep on going; and to take flight into a dark alley after shooting a defenseless woman. Petitioner also knew, according to attorney Collins' testimony, where he had been from the time of the shooting until he was arrested next morning, though he told counsel at first that he did not remember where he had been during that time. Counsel had to take these facts into consideration in planning a defense.

In preparing for the trial counsel was confronted with a situation where a number of witnesses would testify that petitioner had been drinking, but not one of them that he had been intoxicated, either on February 15, 1940, or at any other time since October 1939. Another attorney might have decided to take a chance on calling these witnesses; but it can be understood that Mr. Collins, experienced in the defense of murder as well as other criminal cases, and realizing the danger of adverse witnesses, thought best to rely on the testimony of petitioner himself and such facts as the finding of the whisky bottles and petitioner's presence in the firehouse the morning after the shooting. It was not counsel's duty to attempt to fabricate a defense, nor to ask persons to testify that petitioner was intoxicated, after being told by them that they had never seen him

so. Counsel was relying definitely upon petitioner to be a witness in his own behalf, and it was not until the last moment that, in defiance of his attorney's advice, he refused to do so. The self-willed attitude of petitioner frustrated counsel's efforts in his behalf. Whether counsel used the best judgment in planning a defense, and whether his plan was the best that could have been devised, need not be determined. The plan, which counsel was unable to carry through because of petitioner's last minute refusal to take the witness stand, did not show negligence, incompetence or lack of interest sufficient to constitute denial of the constitutional right to assistance of counsel.

In the order directing testimony to be taken before the referee at Ely, it was ordered, with the consent of the parties, that objections to testimony should be stated in the referee's report and ruled upon by this court. It is now ordered that all said objections be, and they are hereby overruled. The motion to strike appearing at line 19 on page 33 of the referee's transcript is granted, as is also the motion to strike appearing at lines 2, 3 on page 35 thereof. It is further ordered that the objection appearing in folio 56 of the reporter's transcript of testimony taken in this court on this hearing be, and the same is hereby overruled.

This proceeding is dismissed, and petitioner is remanded to the custody of the warden of the state prison.

ON PETITION FOR REHEARING

March 21, 1942.

*Oliver C. Custer, Grant L. Bowen,* and *John E. Robinson,* all of Reno, for Petitioner.

*Gray Mashburn,* Attorney-General, *W. T. Mathews*

and *Alan Bible,* Deputy Attorneys-General, of Carson City, and *John W. Bonner,* District Attorney of Ely, for Respondent.

## OPINION

By the Court, TABER, J.:

A petition for rehearing has been filed in the above-entitled matter, but cannot be considered in a case of this kind. Ex Parte Washer, 200 Cal. 598, 254 P. 951, 956; Eureka County Bank Habeas Corpus Cases, 35 Nev. 80, 151, 129 P. 308; Ex Parte Robinson, 71 Cal. 608, 12 P. 794; Ex Parte Shoemaker, 25 Cal. App. 551, 144 P. 985; Application of Travers, 48 Cal. App. 764, 192 P. 454; Scott and Roe, Habeas Corpus, p. 72.

Petition denied.