THE STATE OF NEVADA, Respondent, v.
GREGORIO ARELLANO, Appellant.

No. 3604

February 19, 1951.                    227 P.2d 963.

*Peter Echeverria* and *C. Clifton Young,* of Reno, for
Appellant.

*Alan Bible,* Attorney General, *R. L. McDonald,* Deputy
Attorney General, *Harold O. Tabor,* District Attorney,
and *Grant L. Bowen,* Deputy District Attorney, of Reno,
for Respondent.

## OPINION

By the Court, EATHER, J.:

Appellant was convicted of the crime of murder of the first degree, and the penalty of death was imposed. An information was filed on September 15, 1949, in the Second judicial district court, in and for the county of Washoe, charging the appellant with the crime of murder, and he was duly and regularly scheduled to be arraigned on September 15, 1949, at which time C. Benson Tapscott was appointed as counsel to represent him, and on said September 15, 1949, the arraignment was continued to October 7, 1949. Thereafter, to wit, on October 7, 1949, the appellant duly and regularly entered his plea of not guilty and the trial date was fixed for November 30, 1949. The trial commenced on that day and ended on December 2, 1949, when the jury returned its verdict of guilty of murder of the first degree and fixed the punishment at death. The appellant did not testify and presented no evidence in his behalf. Thereafter and pursuant to the verdict of the jury, sentence of death was imposed by the Second judicial district court on December 7, 1949.

No motion for a new trial was made, but on February 15, 1950, the appellant petitioned the court for the

appointment of defense counsel to investigate and consider the rights of appellant in an appeal from the judgment rendered therein. Pursuant to the petition the court appointed Peter Echeverria, esq., to act on behalf of the appellant and to take such steps as he deemed necessary in his behalf. On February 20, 1950, a notice of appeal from the said judgment and the whole thereof was duly filed with the clerk of the second judicial district court. The grounds urged on this appeal for a reversal of the judgment may be grouped under seven heads, namely: (1) Is the indigent appellant entitled to the presentation of a reasonably competent defense under "due process" requirements? (2) If the defendant or appellant is so entitled, did he in this case receive a type of trial that is guaranteed by these requirements of "due process?" (3) Was the defense so incompetently conducted as to violate the requirements of "due process" and require the granting of a new trial? (4) Did the court commit prejudicial error in instructing the jury that voluntary intoxication is no excuse to a crime committed under its influence, even when the intoxication is so extreme as to make a person unconscious of what he is doing or to create temporary insanity, when considered in connection with the further instruction given, hereinafter discussed? (5) Did the court commit reversible error in allowing to be introduced in evidence a colored picture of the deceased? (6) Did the court commit reversible error in allowing, over objection of the defendant's counsel, testimony of admissions of the defendant? (7) Did the state sufficiently discharge the burden of proof incumbent in this type of case?

At the trial of the action, the following witnesses appeared for and on behalf of the State of Nevada, and a summary of their testimony is as follows:

George F. Crook, who resides at 1228 "A" Street in Sparks, Nevada, testified that he was a druggist by profession and that he had been employed by Hilps Drug

Store in Sparks, Nevada, prior to the night of August 10, 1949, and that he was so employed on the night of August 10, 1949, the evening when, as it is alleged in the information, Esperanze Rodriquez was shot and killed by Gregorio Arellano. According to his testimony, the deceased and Jean Martin, both employees at the soda fountain, left the drug store at about 10:15 p. m., and that the three of them started walking west on "B" street to their respective homes in the western section of Sparks. Mr. Crook was walking on the outside next the sidewalk, the deceased was walking next to the buildings on "B" street, and Mrs. Jean Martin was walking between these two people. As they approached the entrance to the Crystal Bar, which is at the corner of 10th street, and "B" street and west of Hilps Drug Store, Mr. Crook testified that he saw Arellano rapidly walk up to the corner entrance of the Crystal Bar and that as they passed the corner entrance by several feet, he heard two shots fired in rapid succession; a third shot followed almost immediately. After the first two shots were fired, Mr. Crook turned to the direction from which they were apparently coming, that is, to the right and rear, and saw Arellano fire a third shot. After that, Mr. Crook then saw the defendant turn the gun on himself and fall to the sidewalk. Esperanze Rodriquez immediately fell to the sidewalk and died almost instantly. He positively identified Gregorio Arellano as the man who shot Esperanze Rodriquez on the night of August 10, 1949.

Mrs. Jean Martin, a co-worker employed at Hilps Drug Store, and who resides at 328 11th Street, Sparks, Nevada, testified to practically the same circumstances as Mr. Crook, but stated that as they were walking past the Crystal Bar, she saw Gregorio Arellano coming out and heard the deceased speak to Arellano. She further testified that she was very frightened, that she heard only two shots and that she ran to the Block S Fountain, which is adjacent to the Crystal Bar.

Dick Avansino, age 17, and a student at the Sparks high school, gave an eye-witness account of the shooting, and stated that while he and his friend Lee Ceccarelli, were standing on the sidewalk in front of the Block S Fountain, he heard three shots, that he saw Gregorio Arellano shoot the deceased three times, that she fell to the sidewalk, and that defendant then shot himself.

Lee Ceccarelli, also a student at the Sparks high school, gave an eye-witness account of the facts and circumstances surrounding the shooting and death of Esperanze Rodriquez, and his testimony was practically the same as the testimony of Dick Avansino.

Gino Questa, who resides at 1561 "A" Street in Sparks, Nevada and is an operator of the Block S Fountain, testified that he was sitting in the back seat of a car owned by Jim Jensen, which car was parked in front of the Block S Fountain; that he saw George Crook, Jean Martin and the deceased walking west on "B" Street, and that as they passed the Crystal Bar, he saw Gregorio Arellano fire three shots into the deceased and then saw him fire a fourth shot into himself.

Jim Jensen, who resides at 337 Pyramid Way, Sparks, Nevada, and is an employee of the Nevada Auto Supply Company in Reno, testified that he had parked his car in front of the Block S Fountain in Sparks, and that he was sitting in the front seat along with Bill Bailey, when he heard a shot and that he then saw the defendant fire two shots into the body of Esperanze Rodriquez as she fell to the sidewalk. He then saw the defendant shoot himself. Furthermore, he positively identified the defendant as the man who did the shooting, and testified that he had known the defendant for sometime prior to the shooting because he had been at one time employed as a bartender at the Owl Bar where the defendant on occasion had cashed his pay checks. Jim Jensen also testified that he saw the defendant and a companion go into the Crystal Bar shortly before the shooting; that he observed his condition and that he saw that he was

not staggering or that he was not acting in an unusual manner.

Bill Bailey, who resides at 242 Caliente Street, Reno, Nevada, and an employee of the Western Cigar Company for approximately three years, testified to the facts and circumstances surrounding the shooting and his testimony was practically the same as that of Jim Jensen and Gino Questa, with the exception that he did not see the defendant go into the Crystal Bar shortly before the shooting.

Dr. H. Earl Belknap, M.D., 1129 "D" Street, Sparks, Nevada, testified that he had known Esperanze Rodriquez practically all of her life and that on the night of August 10, 1949, while approximately a block away, he heard four or five shots; that he hurried to the Crystal Bar where he saw a crowd gathering; that upon his arrival at the scene of the homicide, he ascertained without any trouble that Esperanze Rodriquez was dead.

Dr. Rodney E. Wyman, 729 North Virginia Street, Reno, Nevada, testified that when he examined the defendant at the Washoe Medical Center on the night of August 10, 1949, the defendant was suffering from a gunshot wound; that he did not observe any signs of intoxication about the defendant and that he performed surgery on Gregorio Arellano.

George Rogers, while on duty as an officer in the Sparks police department, testified that a call was received at 10:12 p. m., on the night of August 10, 1949, and that he was requested to go to the Crystal Bar, corner of 10th and "B" streets, where a shooting had taken place. He positively identified the death weapon which was introduced in evidence, as having been picked up by him near Arellano, and that there were four fired cartridges and two unfired cartridges in the revolver.

Officer John Macy, also of the Sparks police department, testified to being called to the Crystal Bar at the corner of 10th and "B" streets, in Sparks, and identified

the gun and shells which were introduced in evidence.

Dr. Lawrence Parsons, autopsy surgeon, testified that he performed an autopsy upon the body of Esperanze Rodriquez; that his examination disclosed the finding of three entrance wounds in the right lower lumbar region of the back of the deceased, and gave as his opinion that death was caused by gunshot wounds. He further identified a lead bullet which he removed from the girl's body as being one of the bullets which could have resulted in the girl's death.

Mrs. Antonio Rodriquez, an employee of the Southern Pacific Railroad Company, and residing at 105–20th street in Sparks, Nevada, testified that she was the mother of the deceased, who had graduated from the Sparks high school during the month of June, 1949. She further testified that Arellano had visited at her home on one occasion a year previous to the shooting, and that so far as she knew, Arellano had never at any time or at all asked her daughter to go out with him, and that, in fact, her daughter never discussed Arellano with her at any time.

Richard Heap, superintendent of the bureau of identification of the Reno police department, being duly qualified as an expert witness, gave his opinion that the bullet which was removed from the body of the deceased by Dr. Lawrence Parsons, was the same bullet which was fired from the .38 calibre Smith and Wesson revolver found in the immediate vicinity of Arellano as he lay on the sidewalk in front of the Crystal Bar.

Tom Williams of the Sparks police department, testified that he was present at a conversation which took place at the Washoe Medical Center on August 11, 1949, and that present in addition to himself, were Mr. Harold O. Taber, Miss Thelma Gault, a court reporter, and Arellano. He testified that certain statements were made by Arellano; that they were given freely and voluntarily and that no promise or hope of reward was

made to Arellano; that in his opinion Arellano understood the nature of the questions and gave rational and coherent answers to the questions asked of him by Mr. Taber. Williams testified, among other things, that Arellano said that he had talked with Esperanze Rodriquez over the telephone around 12 o'clock on the day before the shooting and that the telephone call was made from the Lido Hotel in Reno, Nevada. During this conversation, Arellano stated that the deceased said that she would go out in the car with him sometime, although she said she would not go out with him on the night of the shooting. According to Williams's testimony, Arellano stated that he drove to Carson City, Nevada, by himself and that he had about seven high balls while in Carson City. When questioned by Mr. Taber as to his drunken condition, Arellano stated that he was not very drunk. Arellano stated, according to the testimony of the witness, that he returned to Sparks about 8 o'clock on the night of August 10, 1949; stopped at the Crystal Bar where he had two or three drinks and then drove to the Vista Beer Gardens, which is east of Reno, and had three shots of beer, and after drinking the beer returned to Sparks. He met a friend of his whom he knew as a fellow employee, and they went into the Crystal Bar together where they had something to drink. Arellano then told Williams that he knew where the deceased lived, that he knew that it would be necessary for her to walk west to her home, that it would be necessary for her to pass the Crystal Bar, and that on that particular evening the front door of the Crystal Bar was open thereby permitting one standing in the south end of the bar to have a clear view of the sidewalk and the people walking west on "B" street in Sparks. Arellano then told this witness that shortly after the deceased got off from work he saw her walking west on "B" street accompanied by another girl and fellow, and that as they approached the doorway of the Crystal

142

Bar the deceased said "hello" to the defendant as he reached the doorway, and that Arellano did not say anything, but immediately shot her two or three times although he didn't remember the exact number. According to this witness, he stated that he was not too drunk to know what he was doing, and when asked why he shot the girl, he said, *"Because I like her too much," and he further stated that he didn't like to see her with another boy and that he was jealous.* When asked when he made up his mind to shoot deceased, Arellano said that he had made up his mind when he was driving to Carson City, which was about 4 o'clock in the afternoon preceding the shooting.

Cleophas Gamboa, an employee of the Southern Pacific Railroad Company, and residing in a Sparks dormitory, testified, through a court appointed interpreter, that on one occasion and within three months previous to the shooting he had a conversation with Arellano in which Arellano stated that if Miss Rodriquez *"didn't belong to him, she couldn't belong to any one else."*

Martin Vasquez, also an employee of the Southern Pacific Railroad Company, and residing in one of the dormitories on the railroad property, stated that he had known Arellano for about two years; that he had seen him frequently, and that he had also known the deceased practically all of her life; that he saw the defendant on the morning of August 10, 1949, at about 11 o'clock and had a conversation with him. In response to a question as to whether he, Arellano, would be coming back or if he was not, where he was going, Arellano said that he did not know where he was going, and he further said: "I don't know if I am going to come back."

Robert Aris Burnall, an employee of the Pacific Fruit Express, stated that he had known Arellano for about 15 or 16 months, and that he had occasion to see him on the night of August 10, 1949; that they met in front of the Crystal Bar. After having a drink in the Crystal

Bar, Burnall and Arellano walked to the Waldorf Bar, which is directly east of and adjacent to the Hilps Drug Store, where they had another drink together. After that, they left and started to walk to the Crystal Bar, and as they did so Arellano looked into the window of the drug store, but did not say anything. They went into the Crystal Bar, stood at the south end and ordered a drink. Arellano kept watching the front entrance and without saying anything suddenly walked to the front door and outside. Burnall heard three rapid shots in a row, and then heard another shot. As he went outside, he saw that Arellano was lying near the entrance to the bar and that the gun was lying about two feet from his left side. Burnall also testified that prior to the shooting, Arellano acted in a natural manner, did not seem to be excited and that he never at any time mentioned the fact that he had a gun in his possession. *He further stated that Arellano did not appear to be drunk and that in general, he appeared to act normal to him.*

Deputy Sheriff Jack Goss of the Washoe County sheriff's office testified that he was present at a conversation in the office of the district attorney of Washoe County, Nevada, on the afternoon of Friday, August 26, 1949, at about the hour of 4 p. m. and that present in addition to himself, was Mr. Harold O. Taber and Miss Thelma Gault, a court reporter. Deputy Goss testified that Arellano *answered all questions asked of him freely and voluntarily, stated that no promise or offer of immunity was made to Arellano,* and that in his opinion Arellano understood the questions asked of him and answered in a coherent and intelligible manner; that in general Arellano told Mr. Taber that the day before the shooting at about 3: 30 he came to Reno and got drunk, that he stayed at the Los Angeles Hotel in Reno that night and got about six hours sleep; that he got up about 9: 30 the morning of August 10, had a couple of beers and went down to Sparks; that he

arrived in Sparks about 10 or 10:30; he drank a bit at the Owl Bar, remembered that it was pay day and went to the Southern Pacific office where he got his check; that his check was for one hundred five dollars and some odd cents; that he cashed his check at the Owl Bar about 11 o'clock that morning, drank again, took a taxi and came to Reno to get his car; that he had left his car in front of the Lido Bar on Lake Street. He further testified that Arellano, after he picked up his car, drove to Fallon, stopping in Fernley where he got a shot of beer; that upon arrival in Fallon at about 2 o'clock he went to see a girl at a house where he stayed about 20 minutes; that he went to a bar and drank again and had something to eat and returned to Sparks, stopping at Fernley at the same bar; that from Sparks he drove to Carson City where he arrived around 5 o'clock and that he drank beer at two bars, one of which he did not know the name of and the other was the Toscano at Carson City; that he left Carson City around 8:30 and returned to Sparks; that on all of these trips, Sparks to Reno, to Fallon, to Carson City and return he was alone; that he arrived in Sparks about 9:45, and that he had a watch with him all the time and from Sparks he went out to Vista where he had some beer. When asked what kind of beer he drank, he said, "Sierra"; that he then returned to Sparks and parked his car in front of the Waldorf Bar, and that he got out of his car and found a friend of his whose name he did not recall but who worked for the P.F.E. and that he and his friend had a drink at the Waldorf Bar;, that he told his friend that he wanted to go get a drink at the Crystal Bar stating, *"I was waiting for the girl to get off";* that he and his friend walked in front of Hilps Drug Store, that he looked in as he went by and saw that she was working; that he and his friend went into the Waldorf Bar where he had another shot of whiskey and then went to the Crystal Bar where he had another shot of whiskey; that when he saw the girl whom he

called Esperanze, he went to the doorway and shot her; that he didn't know where he shot her, but that he remembers shooting her three times and that then he shot himself through the stomach from the right side. When asked whose gun he used *he stated that it was a .38 Special belonging to him, that it had six cartridges and that he had owned it since 1947, having purchased it in Reno, and that he had shot it several times in target practice.* He stated, according to this witness that he had kept the gun in his cabin and that he put the gun in the car in a little box on the dash board when he left Sparks for Fallon, *that he had made up his mind to shoot the girl the night before and that he took his gun out of the car when he stopped in front of the Waldorf Bar and put it in his pocket; that the reason he did this was because he intended to shoot the girl.* When asked the reason for shooting the girl Arellano *stated it was for love,* that she had promised to go out with him, to go for a ride in his car and that he had talked with her the night before and again that day by telephone and that she had changed her mind, that she had told him, no; that he had never taken her any place but that she had waited on him in Hilps Drug Store. *He was asked if he made any plans to shoot her and he said no, he just intended to shoot her, that he was jealous;* that he knew where she worked, that she got off work at 10 o'clock; that he knew in which direction she would walk as she left work to get to her home and that she would pass in front of the Crystal Bar and that he waited for her in the Crystal Bar, and that he made sure she was working and knew his gun was loaded, *that he had loaded it himself when he put the gun in his right front pocket.* When asked if he knew what he was doing when he shot her, he said yes, he knew, that he recognized her as soon as he saw her; he knew she was in the store and there was another girl with her and another man. That he had never seen the other man before and that when he shot himself he intended to kill himself; that he shot himself

once and that he remembers the girl telling him "hello" just before he shot her.

In brief, appellant's contention here is that "due to mistakes, errors, apathy and negligence of court appointed counsel" he was denied assistance of competent counsel and so is being deprived of his life without due process. It is also contended that there was prejudicial error in instructing the jury and also that the state did not meet the burden of proof as to deliberation and premeditation.

A reading of the entire transcript gives no indication that the trial attorney was apathetic or negligent or that in the preparation and trial of the case he was guilty of any lack of skill. The present contention seems to be chiefly that the defense of insanity should have been interposed. There is, in our opinion, nothing in the case to indicate that such defense would have had any fairly reasonable promise of success. The chance of such a successful defense seems to be very remote. Trial counsel obtained an instruction as to the effect of appellant's drinking as bearing upon the deliberation and premeditation necessary for first-degree murder and he cross-examined at length every one of the prosecution's witnesses to bring out in further detail the extent of appellant's drinking on the day before the killing and the day of the killing. There is no suggestion that counsel did not argue this point to the jury.

Appellant's counsel is criticized for failing to object or for failing to insist more strenuously on his objections to certain evidence. The claim is not substantiated by a reading of the transcript.

Defense counsel was criticized for not producing witnesses as to the appellant's insanity, as to his reputation, etc., but no slightest suggestion is made that there were any such witnesses available or that defense counsel did not as a matter of fact make a complete investigation

and search. Appellant's brief further states frankly that he has no further evidence to produce.

Certain errors in ruling on admissibility of evidence are asserted. The most important ones go to the testimony as to two separate confessions. We see no merit in any of the assignments of error.

Appellant did not take the witness stand in the lower court. That he killed Esperanze Rodriquez was proved by eyewitnesses, and the killing has never been denied by him. In the two separate confessions appellant stated that if Miss Rodriquez *"didn't belong to him, she couldn't belong to any one else."* When asked why he shot the girl he said, *"Because I like her too much,"* and he further stated that he *didn't like to see her with another boy, and that he was jealous*. These statements definitely show the motive for the killing. In the opening brief of counsel for appellant it is stated, "* * * the deceased, with whom the appellant was secretly enamored, although he knew her but slightly." Thus the secret love which the defendant had for the girl is admitted by counsel for appellant.

His statement disclosed a motive, and from all the circumstances the jury was warranted in concluding that the killing was done with malice and deliberation.

Counsel for appellant in this court did not represent him at the trial of the case, and they contend that his counsel in the court below handled the case so incompetently as to violate the requirements of "due process" and further that the "defendant was not given the type of trial ensured by our Constitutional concept of fair play. Because of the incompetency and apathy with which the defense was presented in the district court, the appellant will have been denied his day in court, in any real sense, unless this Honorable Court sees fit to grant a new trial."

"Upon these alleged shortcomings counsel here make

a strong appeal for the reversal of the judgment. Whether appellant would have fared better under the guidance of other counsel is, of course, entirely speculative, but, in view of the evidence upon which the jury found him guilty, it is safe to say that he might have been convicted even if counsel of great skill had defended him in the court below.

"Ordinarily, the negligence, or unskillfulness of counsel for a defendant in a criminal case is no ground for reversal." State v. Jukich, 49 Nev. 217, 242 P. 590, 595; Ex parte Kramer, 61 Nev. 174, 122 P. 862.

In the case of State v. Jukich, supra, this court quoted approvingly from Sayre v. Commonwealth, 194 Ky. 338, 238 S.W. 737, 738, 740, 24 A.L.R. 1017, as follows: "Without overriding the general rule of law applied by this court and others of this country, we cannot reverse the judgment and grant appellant a new trial on the grounds of the incompetency and unskillfulness of appellant's lawyer, for it cannot be said that he has not received a fair and impartial trial."

"Counsel in the lower court is criticized for not having made a motion for a change of venue. The crime was indeed a brutal one, but there is nothing to indicate that a fair and impartial jury could not have been obtained, or that any public feeling existed in the community against the accused, or that any hostile feeling had been manifested against him at all. So far as appears, such a motion, if made, would have been properly denied." State v. Jukich, supra.

The argument of appellant's counsel on this appeal to the effect that the failure to object to many questions asked by the district attorney which it is claimed elicited testimony of a prejudicial nature, indicated incompetency, takes a very wide range. We do not propose to follow it and discuss in detail the various questions and responses thereto stressed by counsel. We have examined the entire record in this regard, and do not

find anything worthy of serious consideration in sustaining the claim of neglect and incompetence. An attorney's ability cannot be measured by the number of objections he makes. There is no showing that appellant had any defense. "Cases of murder without real defense are not uncommon." If appellant had any true defense it was his duty to disclose it to his counsel, and if the latter was unwilling to present it, to appeal to the court to assign him counsel who would. He cannot wait until after conviction and expect to have another trial on another theory of defense by shifting the blame for the one which failed, upon his counsel.

Appellant next urges that the court committed prejudicial error in reading instruction No. 12 to the jury. Instruction No. 12 is as follows: "Voluntary intoxication is no excuse to a crime committed under its influence, and this is so even when the intoxication is so extreme as to make the person unconscious of what he is doing or to create temporary insanity."

No error was committed from the giving of this instruction. Instructions 11 and 12 when read together, clearly state the law. Instruction No. 11 reads as follows: "No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of his intoxication may be taken into consideration in determining such purpose, motive or intent." State v. Thompson, 12 Nev. 140; State v. Johnny, 29 Nev. 203, 87 P. 3; State v. Butner, 66 Nev. 127, 206 P.2d 253.

"In determining whether an instruction is erroneous, the whole charge relating to the same subject must be taken together and considered as an entirety." State v. Pritchard, 15 Nev. 74; Allison v. Hagan, 12 Nev. 38;

State v. Raymond, 11 Nev. 98; State v. Donovan, 10 Nev. 36.

Counsel on this appeal state that defendant's trial attorney patently had no plan of defense whatsoever. The record does not substantiate this. Our reaction to the record is that trial counsel apparently concluded that the best he could accomplish for his client was to save him from the death penalty; that to this end he assiduously devoted himself to the obtaining of all the testimony possible as to defendant's excessive drinking during the period preceding the shooting; that he did this through cross-examination of the state's witnesses because they comprised, so far as known, all of the witnesses who could testify to such facts; that in furtherance of such plan he obtained instructions from the court as to the propriety of the jury's considering the defendant's state of intoxication to determine whether he could have been guilty of deliberation and premeditation in the shooting. The transcript does not include his argument to the jury, but defendant's present counsel have not even intimated that he did not argue the point earnestly and forcibly.

As there is no prejudicial error in the record, the judgment and order appealed from are affirmed, and the district court is directed to make the proper order for the carrying into effect by the warden of the state prison of the judgment rendered.

BADT, C.J., and MERRILL, J., concur.

### ORDER DENYING PETITION FOR REHEARING

July 2, 1951.

*Per Curiam:*

Rehearing denied.