THOMAS LEE BEAN, APPELLANT, *v.* THE
STATE OF NEVADA, RESPONDENT.

No. 5788

February 3, 1970          465 P.2d 133

[Rehearing denied March 11, 1970]

*Richard O. Kwapil, Jr.,* and *Jerry Carr Whitehead,* of Reno, for Appellant.

*Harvey Dickerson,* Attorney General, *William J. Raggio,* District Attorney, and *C. Frederick Pinkerton,* Deputy District Attorney, Washoe County, for Respondent.

**OPINION**

By the Court, ZENOFF, J.:

Thomas Bean, age 18, was convicted of the murder of Sonja McCaskie and sentenced to death. He had not known the victim.

During a customarily sleepless night he was prowling a neighborhood looking for women's clothing on clothes lines which was his characteristic for sexual gratification. He had rape in mind if the opportunity presented itself. Finding a door to Sonja's apartment unlocked he removed his shoes, entered, took several precautions against detection and did several other things preparatory to committing the act of rape upon Sonja whom he observed sleeping alone in her bedroom. Using a garrote which he had brought with him he twisted it around her neck and increased the pressure when she awakened and pleaded for her life. It is not clear whether she was still alive when he stabbed her several times with his knife and committed the act of rape, but he completed the act of rape and murder.

Thereafter, he dragged her body out of the bedroom, cut her heart out and threw it on the floor, cut off her head, tried to skin her like a carcass in a slaughter house, slit her from the crotch to her neck and then stuffed the body in a hope chest. Before that he had tossed the head into the chest "like a basketball." A foot was hanging out of the chest so he cut that off and left it lying on the floor. During all of this he had stabbed her many times with his knife and with knives taken from Sonja's kitchen. Bean then lolled around listening to her musical records and tiring of that took her sports car for a joy ride, returned, and left. A statement of facts is found in Bean v. State, 81 Nev. 25, 398 P.2d 251 (1965), when this court affirmed his conviction. Bean now asserts through our post-conviction statute, NRS 177.375, constitutional rights that had not been otherwise reviewed.

Decisions of the U.S. Supreme Court rendered after the appeal directly relate to several of the asserted issues now before this court. Those issues are (1) that members of the jury venire were improperly excused (2) the publicity surrounding the trial was of such nature a fair trial was denied him, and (3) that he had been denied effective assistance of counsel. This court referred the petition to the district court for an evidentiary hearing.

To the contentions that (a) the jury was not representative of the community where the trial was held (b) that pretrial publicity precluded a fair trial, and (c) that Bean was denied effective assistance of counsel the trial court ruled for the state on the last two, but did not rule at all on the first but referred that question to this court because we had not asked the trial court to go into the subject in the order of reference.

A.   THAT THE JURY SELECTION VIOLATES THE STANDARDS ESTABLISHED IN WITHERSPOON v.

84

ILLINOIS, 391 U.S. 510 (1968), DECIDED BY THE U.S. SUPREME COURT THREE YEARS AFTER WE REVIEWED BEAN'S TRIAL IN BEAN v. STATE, SUPRA.

At Bean's trial a panel of 80 prospective jurors was drawn. Thirteen of that number were excused by the court after the typical following exchange in the voir dire examination:

DEFENSE COUNSEL: "Do you have a conscientious qualm against the death penalty?"

JUROR: "Yes, I do."

QUESTION: "Do you feel that you could not render a decision for the death penalty?"

ANSWER: "I am afraid not."

DEFENSE COUNSEL: "I will anticipate the state's challenge and will stipulate, your honor."

PROSECUTOR: "We will stipulate, your honor."

THE COURT: "Based upon the stipulation, I am going to excuse you from serving and thank you very much for coming."

1. The U.S. Supreme Court in *Witherspoon* declared that a jury which excludes all those persons with some bias against the death penalty cannot perform the task of determination of penalty demanded of it, and that a death penalty imposed by such a death-oriented jury cannot stand. A man who opposes the death penalty no less than one who favors it can make a discretionary judgment entrusted by the state and can thus obey the oath he takes as a juror. P. 519. Before he can be excluded a juror must make "unmistakably clear" (1) that he would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (2) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt. Pp. 522–523, footnote 21.

The standard or test pronounced and mandated by that decision is directed at the questioning of jurors who are summoned to serve in a capital case. If they simply state that they are against capital punishment and are thereby excused, reversible error is committed. Whatever penalty has been imposed by a jury in that case cannot stand.

At the time of Bean's trial on June 24, 1963 our statute specifying grounds for challenge of jurors for cause NRS 175.105(9) provided: "If the offense charged is punishable with death [a ground for challenge is], the entertaining of such conscientious opinions as would preclude his [the juror] finding

the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror."[1]

The U.S. Supreme Court directs that in order for a challenge to be properly asserted under that statute there must be a thorough examination of each juror who asserts a bias for or against the death penalty to determine whether or not his bias can be set aside and whether the juror could nevertheless determine the issue of innocence or guilt and penalty upon the evidence presented before him. If he can then he is a qualified juror and must be allowed to sit unless excused by peremptory challenge. The fact of his bias alone is not ground for discharge from the jury. The extent of *Witherspoon* does not destroy the trial, only the penalty, but its ruling is retroactive.[2]

In the case of In re Anderson, 447 P.2d 117 (Cal. 1968), the California court ruled that where one or more of the prospective jurors were excused on the ground that it was not unmistakably clear that he would automatically vote against the imposition of capital punishment without regard to any evidence, or that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt, error was committed. Statements such as: "I am opposed to the death penalty," "I don't believe in capital punishment," are insufficient to disqualify such a juror because it is not clear that he or they could not set aside those conscientious convictions and determine the case from the evidence. See also, In re Eli, 454 P.2d 337 (Cal. 1969); State v. Atkinson, 167 S.E.2d 241 (N.C. 1969); State v. Ruth, 170 S.E.2d 897 (N.C. 1969).

2.   Defense counsel's failure to object to the exclusion of the prospective jurors does not bar him from now claiming error. There is a duty upon the court to make it clear to the prospective juror that opposition to the death penalty or conscientious scruples against that penalty would be insufficient to disqualify him from service. Failure to do so is understandable since the trial was long before the U.S. Supreme Court rendered its decision in *Witherspoon* which sets forth new rules that the states are required to follow and to apply retroactively. In re

[1]NRS 175.105(9) was removed from the code when Nevada revised its whole chapter on criminal procedure in 1967. Its present counterpart is 175.036(1) which was added in 1968.

[2]General illuminating discussions are contained in 82 Harv.L.Rev. 162 (1968); 42 S. Cal.L.Rev. 329 (1969); 1969 Utah L.Rev. 154.

Arguello, 452 P.2d 921, 922 (Cal. 1969). Thus, there is no merit to the defendant's failure to object in the trial court to the exclusion of the member as a bar to the present claim of error. Boulden v. Holman, 394 U.S. 478 (1969); People v. Risenhoover, 447 P.2d 925, 936 (Cal. 1968); In re Anderson, supra; People v. Sears, 450 P.2d 248 (Cal. 1969). A stipulation that a prospective juror may be excused for cause, made upon the erroneous assumption that the juror is disqualified, must be similarly treated.

3. Bean had three peremptory challenges unused, the state one, but even though peremptory challenges still remained the court of California holds that to be of no effect. People v. Sears, supra, at 257; People v. Beivelman, 447 P.2d 913 (Cal. 1968). Although Bean had three unexercised peremptory challenges and one remained for the state, the factor of unused peremptories could not overcome the total number of jurors who were invalidly excused even were we permitted to accept the leftover peremptories argument. People v. Speck, 242 N.E.2d 208, 227 (Ill. 1968). The record here shows a systematic exclusion of jurors who were not examined sufficiently once they answered regarding their feelings about the death penalty.

4. The question by the court, "Is it your frame of mind that you could not and you would not, under any circumstances, *regardless of what the evidence might be,* return a verdict carrying with it the death penalty?" was satisfactory in People v. Nye, 455 P.2d 395, 399 (Cal. 1969). But the words "in a proper case" ordinarily lacking in precise unmistakable clearness may be acceptable if in the general interrogation by the court it is previously made clear that what constitutes a proper case for the death penalty was for the determination of the individual jurors. See also People v. Mabry, 455 P.2d 759 (Cal. 1969); People v. Williams, 456 P.2d 633 (Cal. 1969); People v. Vaughn, 455 P.2d 122 (Cal. 1969); In re Hillery, 457 P.2d 565 (Cal. 1969).

"I don't agree with the death penalty" alone is insufficient (In re Seiterle, 456 P.2d 129 (Cal. 1969)) and the defect is not cured by referring to the entire examination of the other jurors because the correct examination must be centered on each juror. In order to ascertain what the juror means by his answers the court must consider not only the words of the

answers but also the words of the questions and, additionally, all of the circumstances in which the colloquy takes place. The answer "not the death penalty, no" is not enough to disqualify unless somewhere it is made clear to the prospective juror that it is entirely in his discretion what is a proper case to impose it. People v. Varnum, 450 P.2d 553, 561–62 (Cal. 1969). In re Tahl, 460 P.2d 449 (Cal. 1969); Sims v. Eyman, 405 F.2d 439 (9th Cir. 1969); Bell v. Patterson, 402 F.2d 394 (10th Cir. 1968). The supreme court has already remanded cases because of prejudicial jury selection violative of *Witherspoon.* Boulden v. Holman, supra; Spence v. North Carolina, 392 U.S. 649, on remand, 164 S.E.2d 593 (N.C. 1968).

5.   The thesis of *Witherspoon* is whether the totality of the trial court's treatment of the subject operated to deprive the defendant of being tried by a jury of representative quality. The jury must constitute a segment of the community within the concept that a jury shall be drawn from a cross-section of the community. State v. Mathis, 245 A.2d 20 (N.J. 1968). The defendant is entitled to a jury that is not a hanging jury and the state is entitled to a jury capable of imposing the death penalty.

6.   Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and pro and con they are forceful either way—the death penalty has been employed throughout our history and is still the law and still may be imposed by a jury. Therefore, as stated by Justice Stanley Mosk in his concurring opinion in *Anderson,* personal conviction for or against the death penalty does not come in for consideration in this judicial determination. See also State v. Atkinson, supra.

We are compelled to apply *Witherspoon* to each case. It must appear from the record that the prospective juror is unable to return a death sentence no matter what may be the facts of the case. Segura v. Patterson, 402 F.2d 249 (10th Cir. 1968). Whenever the vent of a juror is for or against capital punishment he is not disqualified if he is still able to entertain the issue of guilt or innocence on the basis of the evidence before him. Whenever a prospective juror answers that he has a religious conviction or personal scruple or opinion concerning capital punishment which would render him unable to return a verdict carrying a death penalty he must be questioned further on the nature of his beliefs and then be confronted with the

question whether his views are so firm or fixed that he is unable to return the death penalty under any case. If he then says he is unable to do so he may be excused for cause. So also must a juror who is so firmly of the view that a murderer should die. State v. Mathis, supra; State v. Forcella, 245 A.2d 181 (N.J. 1968); State v. Pruett, 248 N.E.2d 605 (Ohio 1969); cf. State v. Wigglesworth, 248 N.E.2d 607 (Ohio 1969); People v. Speck, 242 N.E.2d 208 (Ill. 1968); People v. Moore, 246 N.E.2d 299 (Ill. 1969).

7.  So long as one or more jurors were wrongfully excused the penalty feature of the trial is destroyed. People v. Vaughn, supra; In re Arguello, supra; cf. Bell v. Patterson, supra, at 398–399; People v. Washington, 458 P.2d 479 (Cal. 1969); People v. O'Brien, 456 P.2d 969, 974 (Cal. 1969); Whisman v. State, 164 S.E.2d 719 (Ga. 1968).

8.  The comments of COLLINS, C. J., and BATJER, J., are unsupported by any court that has passed upon a case arising under the *Witherspoon* decision. They make no reference to citations of authorities even in face of the long list already in existence. Instead, those cases affirm that the interpretation of *Witherspoon* is as we have stated it, to wit, that *the record must show* a searching examination of the jurors in order to establish that their objections to the death penalty would not automatically disqualify them. See for example the latest reiteration of this principle in People v. Brawley, 461 P.2d 361, 373 (Cal. 1969).

The first language of the *Witherspoon* case which CHIEF JUSTICE COLLINS quotes sets the stage for what that case does not apply, to wit, that it does not decide the *validity* of the death penalty as a challenge for cause in the first instance. The case decides only that prospective jurors in a capital case who voice an opinion about the death penalty must be further examined in order to establish whether or not they can vote on the issue of guilt and innocence and penalty on the evidence and disregard their fixed bias.

In reference to the comments of BATJER, J., exclusive of those in which he approves of the COLLINS' analysis, he further stresses that Bean's counsel, Anderson, "stipulated" to the exclusion of certain jurors. Attempting to justify an affirmance on that ground is a long stretch. The exclusion of the jurors or any one of them was not on an ad hoc (for this case only) basis, but was pursuant to a policy or practice long existent in Nevada by which both the state and the defense erroneously

assumed that a belief concerning the death penalty was an automatic ground for disqualification for cause. Anderson's offer to stipulate reflects that pattern. It was obviously not given in the same sense as waivers or stipulations are ordinarily given, but was like the "no questions" or failure to object as in Boulden v. Holman, supra. There the typical colloquy was:

THE COURT: Do you have a fixed opinion against capital punishment?

MR. SEIBERT: Yes, sir.

PROSECUTING ATTORNEY: We challenge.

THE COURT: Defendant?

DEFENSE: No questions.

THE COURT: Stand aside. You are excused.

Other examinations of the same nature are therein recited on pages 482 and 483. The court repeated from *Witherspoon* that "unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment *no matter what the trial might reveal* it cannot be assumed that that was his position." The record must show that the juror would vote against the penalty of death *regardless of the facts and circumstances that might emerge in the course of the proceedings.* Most of the cases previously cited recite the typical questions which are parallel to those cited by CHIEF JUSTICE COLLINS and JUSTICE BATJER. For instance, in *Anderson* one prospective juror was asked, "Do you know of any reason you couldn't be a fair and impartial juror in this case?" Reply: "Yes, sir, I do. I don't believe in capital punishment." Anderson, supra, at 120. The cases do not specify any importance to whether or not there was or was not an objection when a juror was excused because of a death penalty bias. The exclusion was in all cases held to be wrong under *Witherspoon* requirements.

As to the contention of JUSTICE BATJER that Anderson failed to object and waived any right to object, see In re Hill, 458 P.2d 449, 464 (Cal. 1969). "Since petitioners were tried before *Witherspoon,* failure to object to the exclusion of the prospective jurors in question does not bar petitioners from now claiming error. . . . We cannot assume that counsel would have refused to undertake further examination of veniremen had *Witherspoon* been decided prior to trial. Their failure to do so at this pre-*Witherspoon* trial therefore does not constitute a waiver of the right to raise error in the exclusion of prospective jurors in this collateral attack."

9. To any extent that our previous cases of State v. Williams, 50 Nev. 271, 257 P. 619 (1927); Spillers v. State, 84 Nev. 23, 436 P.2d 18 (1968); Howard v. State, 84 Nev. 599, 446 P.2d 163 (1968), are inconsistent with our ruling in this

case, they are overruled. However, Howard declared only the incompatability of our statute with the Illinois statute in reference to the challenge for cause founded on the death penalty.[3]

[3]The particular statutes relating to the challenge for cause when the death penalty is involved in the states from which our cited cases derive are:

Ala. Code, Title 30, § 57. On the trial for any offense which may be punished capitally, or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person has a fixed opinion against capital or penitentiary punishments, or thinks that a conviction should not be had on circumstantial evidence; which cause of challenge may be proved by the oath of the person, or by other evidence.

Ariz. Rule Crim. Proc. 219(a). Any party may challenge an individual juror upon the ground that the juror:

. . . .

(14) If the offense charged is punishable by death, entertains conscientious opinions which would preclude his finding the defendant guilty, in which case he shall neither be permitted nor compelled to serve as a juror.

Cal. Pen. Code Ann. § 1074(8) is exactly the same as Nevada except it starts "If the offense charged be . . . ."

Colo. Rev. Stat. Ann. § 78–5–3. No person summoned as a juror in a criminal case shall be disqualified to serve as such by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused; provided, the court shall be satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict, according to the law and the evidence submitted to the jury in the trial of such cause.

N.J. Rev. Stat. § 2A:78–4. Upon the trial of any cause, civil or criminal, all parties may, within the discretion of the court, question any person summoned as a juror, after his name is drawn from the box and before he is sworn as a juror, and without the interposition of any challenge, to elicit information for the purpose of determining whether or not to interpose a peremptory challenge, and of disclosing whether or not there is cause for challenge. In all cases in which a death penalty may be imposed, the examination as to competency shall be under oath, but in other cases it shall be made without putting the juror under oath. Such questions shall be permitted for the purpose of disclosing whether or not the juror is qualified, impartial and without interest in the result of the action. The questioning shall be conducted under the supervision and control of the trial judge and in open court.

N.C. Gen. Stat. § 9–14 . . . . The presiding judge shall decide all questions as to the competency of jurors.

§ 9–15(a) The court, or any party to an action, civil or criminal, shall be allowed, in selecting the jury, to make inquiry as to the fitness and competency of any person to serve as a juror, without having such inquiry treated as a challenge of such person, and it shall not be considered by the court that any person is challenged as a juror until the party shall formally state that such person is so challenged.

Ohio Rev. Code Ann. § 2945.25. A person called as a juror on an indictment may be challenged for the following causes:

. . . .

(C) In the trial of a capital offense, that his opinions preclude him from finding the accused guilty of an offense punishable with death; . . .

## B. THAT PRETRIAL PUBLICITY DENIED BEAN A FAIR TRIAL.

The crime here was of a sensational nature and it was inevitable that some of the publicity would be of the same character. The district attorney stated to the court that this was the most horrible murder in the history of Nevada. The groundswell of publicity surrounding it was therefore not unusual. Sonja was a comely young woman originally from England, an Olympic skier and well known on the ski hills of this area. The news value of her terrible death attracted national and international news representatives.

The crime and its trial occurred before Sheppard v. Maxwell, 384 U.S. 333 (1966). After comparing news articles and pictures preceding *Bean* and those of *Sheppard* we are not compelled to conclude that the publicity here was prejudicial— sufficient at any rate to cause a new trial on that ground. Extensive news coverage before a suspect is arrested can be helpful to alert the community so that citizens may protect themselves and their children from a killer at large and be of assistance to the police in keeping a watchful eye for suspicious characters.

Eventually the act of Bean pawning Sonja's camera led to his arrest. His footprint at the scene helped to identify him. Almost immediately he admitted the crime in all of its gory details. Both before and after he was caught the district attorney and police chief conducted daily and orderly news conferences in a commendable manner so that rumors did not run wild and so that the officers were not prevented from performing their duties.

In the *Sheppard* case the Cleveland newspapers published cartoons and pictures, most of which were intended to inflame the community against the husband who was known but not yet even charged with the murder of his wife. (See Sheppard v. Maxwell, 231 F.Supp. 37 (S.D. Ohio 1964); Sheppard v. Maxwell, 346 F.2d 707, Exhibits, pp. 758–767 (6th Cir. 1965).) Nothing like that took place here. In *Sheppard* the newspapers clearly attempted to influence the law enforcement and prosecution authorities. So, too, in Silverthorne v. United States, 400 F.2d 627 (9th Cir. 1968), where the United States government officials participated in the dissemination of prejudicial news items about the alleged misdeeds of the bank official who was on trial.

10. Bean points to a televised reenactment of his crime as error, but that portrayal was not such as in Estes v. Texas, 381 U.S. 532 (1965), where television cameras were allowed to

operate in the courtroom during the trial nor as in Rideau v. Louisiana, 373 U.S. 723 (1963), where the defendant actually confessing his crime was televised or a published street poll on guilt or innocence occurred as in Irwin v. Dowd, 366 U.S. 717 (1961). Naturally, we have no way of knowing what effect news media reporting has on jurors, but the samples just given are clearly distinguishable from Bean's reenactment for police authorities of the killing of Sonja.

11.   Nothing was presented by the news media that did not later appear in evidence at the trial. It should be remembered that the fact of who committed the murder was not in doubt or at issue. The issue was whether or not Bean was insane when he committed it. Publicity can affect the penalty in a capital case just as much as it can direct the course of guilt or innocence, but at no time nor in any instance did the representatives of the news attempt to editorially steer the course of the trial or its result. Cf. People v. Speck, supra.

Trials cannot be conducted in a vacuum. They never were intended to be. The requirement is that they be fair, not perfect. The massive pressures of *Sheppard* were not present in this case. Williams v. Dutton, 400 F.2d 797, 801 (5th Cir. 1968).

C.   INADEQUACY OF COUNSEL.

12.   We have already indicated that Bean's defense counsel, Harry Anderson, was competent in the defense of his client at the trial. Bean v. State, supra. Now counsel for Bean point to Anderson's inexperience in criminal matters, his illness during the trial (he died shortly after the trial was over) and that his defense of Bean did not meet the standards of the community. Several attorneys testified as to how they would have handled Bean's defense and their testimony, of course, was contrary to what Anderson did or did not do.

Trial lawyers will always disagree on how a case should have been tried. Second guessing is as characteristic of lawsuits as Monday morning quarterbacking is of football games. But before a denial of due process arises on the ground of inadequate counsel the trial must be a sham, a farce or a pretense. People v. Reeves, 415 P.2d 35 (Cal. 1966); Hollander v. State, 82 Nev. 345, 418 P.2d 802 (1966); State v. Jukich, 49 Nev. 217, 242 P. 590 (1926); Ex parte Kramer, 61 Nev. 174, 122 P.2d 862 (1942); State v. Arellano, 68 Nev. 134, 227 P.2d

963 (1951); People v. Robillard, 358 P.2d 295 (Cal. 1960); People v. Rideaux, 393 P.2d 703 (Cal. 1964); In re Beaty, 414 P.2d 817 (Cal. 1966); People v. Ibarra, 386 P.2d 487 (Cal. 1963); People v. Brooks, 410 P.2d 383 (Cal. 1966); Torres v. People, 411 P.2d 10 (Colo. 1966); Melton v. People, 401 P.2d 605 (Colo. 1965); State v. Calhoun, 399 P.2d 886 (Kan. 1965); Hicks v. Hand, 369 P.2d 250 (Kan. 1962); Loftis v. State, 417 P.2d 374 (Ariz. 1966); Wright v. Craven, 412 F.2d 915 (9th Cir. 1969). Anderson was a respected general practitioner of law, so we must infer, since he is no longer alive to testify, that his tactic was to claim Bean's insanity on the premise that a jury might agree that nobody in his right mind would commit the deeds that Bean did. Even with the right and wrong test of the M'Naghten Rule Bean's event was so bizarre that it challenged sanity. Perhaps Anderson reasoned that the best locale to reach that result was that in which the crime took place. Even though the jury did not agree with him it was a logical tactic and we do not find that Bean's trial was "a sham, a farce, or a pretense."

13.    Petitioner asserts other grounds of error but all other matters were either reviewed in the first appeal or they are without merit. For instance, he says that capital punishment is unconstitutional because it is a cruel and unusual punishment and that furthermore our statute is constitutionally impermissible because it has no prescribed standards to guide the jury. Capital punishment has been long established as a lawful punishment and will not now be declared unlawful by us nor will we declare our legislative provision infirm for lack of a prescribed standard for a jury to follow. Segura v. Patterson, supra, at 254; Modesto v. Nelson, 296 F.Supp. 1375, 1376 (N.D. Cal. 1969); In re Anderson, supra.[4]

D.   PENALTY.

14.    Our conclusion is that the claims of error that pretrial publicity and inadequate counsel destroyed the fairness of the trial are denied. However, the jury selection was prejudicially defective under the *Witherspoon* requirements. A new trial is not compelled, only the penalty is invalid. The finding that

---

[4]Maxwell v. Bishop, presently before the U.S. Supreme Court, may decide at least one of those questions. That court has informed us that *Maxwell* will be decided during the current term.

Bean is guilty will remain, but he is entitled to a new hearing on the question of penalty, this time before a jury drawn according to the *Witherspoon* requirements. This can be done without the authority of a statute such as California, New York, Texas and Pennsylvania have. People v. Friend, 306 P.2d 463, 477 (Cal. 1957); People v. Purvis, 346 P.2d 22, 31 (Cal. 1959); Alexander v. State, 168 S.E.2d 315 (Ga. 1969). *Witherspoon* reversed as to penalty only, not the conviction of guilt.

The conviction will stand. The penalty of death is set aside and that phase is remanded to the trial court for a new hearing before a jury drawn in accordance with *Witherspoon* for a redetermination of punishment.[5]

THOMPSON, J., concurs.

MOWBRAY, J., concurring:

I concur in the opinion of the majority under compulsion of the decision of the United States Supreme Court in the case of Witherspoon v. Illinois, 391 U.S. 510 (1968).

COLLINS, C. J., concurring in part, dissenting in part:

I disagree with the majority opinion of the court holding that the jury selection violates the standard established in Witherspoon v. Illinois, 391 U.S. 510 (1968). I concur in the remainder of the opinion.

As I read Witherspoon, it stands for the constitutional rule that there may not be wholesale elimination of prospective jurors for cause in a capital case who have voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. That did not happen in this case, and in my judgment gives no cause for modification of the penalty.

The record before us does not reveal exactly how many veniremen were initially summoned for jury selection in this case. The record does reveal, however, that 80 persons were examined as prospective jurors. It is reasonable to assume that substantially more than 80 persons were called because after the jurors and alternates were selected and sworn the judge excused the remaining persons summoned on the venire.

A recapitulation of what happened to those 80 veniremen examined by counsel is as follows:

---

[5]Suggested reading for guidelines in the conduct of the penalty trial are: 39 N.Y.U.L. Rev. 50 (1964); 52 Calif.L.Rev. 386 (1964); 21 Stan.L.Rev. 1297, 1311–15 (1969).

Veniremen examined............................................................ 80
    Excused by State on peremptory chal-
       lenges............................................................... 7
    Excused by Defense on peremptory chal-
       lenges............................................................... 5
    Excused for cause because of a fixed
       opinion of guilt........................................ 39
    Excused by stipulation for reasons other
       than having a firm or fixed opinion
       of guilt....................................................... 6
    Excused because of objection to capital
       punishment............................................... 11
    Sworn as Jurors............................................. 12

               Total.............................................. 80

Without further analysis of the 11 veniremen who were excused because of their opinions about the death penalty, it becomes immediately apparent there was no "hanging jury", nor did the State of Nevada "stack the deck" against appellant in the manner ruled unconstitutional in Witherspoon. *Id.* at p. 523.

If one examines in detail the voir dire of the 11 persons excused because of their belief about the death penalty, it becomes even more apparent there was no violation of appellant's rights under the Witherspoon decision. Only two of the 11 jurors excused might be said to have violated the proscription of Witherspoon. They are veniremen Minedew and Bilbrew. The other nine, as I will demonstrate later, were properly excused under the Witherspoon mandate. This is a radically different situation than Witherspoon where, as described by United States Supreme Court, ". . . the trial judge said early in the voir dire, 'Let's get these conscientious objectors out of the way without wasting any time on them.' In rapid succession, 47 veniremen were successfully challenged for cause on the basis of their attitudes toward the death penalty."

In Witherspoon, the high court said, "The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Nor does it involve the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them." *Id* at p. 513.

In the court's own words, the rule of Witherspoon is, "Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed convictions or religious scruples against its infliction." *Id.* at pp. 521, 522.

With that test in mind, limited by the high court as it was, an examination of the reasons why 11 veniremen were excluded from the jury in this case because of objection to the death penalty reveals as follows:

1. Mary Elizabeth Brown testified that she could not render a decision which would call for the death penalty.

2. Bessie L. Severns testified she was afraid she could not render a penalty calling for death.

3. Mary E. Adams testified she felt that if convinced that that [death penalty] was a proper verdict in this case, she would be prevented from returning such a verdict.

4. Vincent E. Johnson testified he didn't think we have the right to vote to take his [appellant's life] just because he may have taken somebody else's life.

5. Murial Vernon testified she didn't believe, in an appropriate case, she would be able to render a verdict imposing the death penalty.

6. Dee A. Edwards testified she didn't believe in capital punishment. She believes every person should have a chance to reform.

7. John H. Dressler testified he had a conscientious scruple against the death penalty and against imposing the death penalty.

8. Dean R. Wilson testified he felt he could not vote for a verdict which would call for the death penalty.

9. Joseph Ferro testified he felt he could not impose the death penalty in a proper case.

It is arguable under Witherspoon that none of the foregoing nine persons were improperly excused as jurors.

The two who can be said to have been improperly excused pursuant to Witherspoon are:

1. Mickey Minedew testified, "I could return a verdict of guilty if the facts in this case and if the evidence presented on the part of the State was sufficient to satisfy my mind the defendant was guilty."

2. Rosie L. Bilbrew testified, "I am not for capital punishment."

The high court said in Witherspoon, ". . . A jury that must choose between life imprisonment and capital punishment can

do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." *Id.* at p. 519. That court condemned the actions of the Illinois court in these words, "But when it swept from the jury *all* who expressed conscientious or religious scruples against capital punishment and *all* who opposed it in principle, the State crossed the line of neutrality." *Id.* at p. 520.

In examining the voir dire examination of the 12 persons who were selected and sworn as trial jurors in this case, it cannot be said that all prospective jurors who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle were swept from the jury.

Juror No. 5, Linda L. Ayala, testified that she did not have the feeling that because a person may have killed another person he himself should be killed, and that she did not necessarily believe in the philosophy of an eye for an eye or a tooth for a tooth, but that the circumstances of the case would determine her agreement or disagreement with that philosophy.

Juror No. 7, Janice A. Morris, in response to a question whether she had any conscientious scruples against imposition of the death penalty, answered, "Well, this is a question I have been battling since I came into the courtroom. It is not something that I really knew, whether I did or didn't. I think, if I felt that I was convinced that this was the penalty, that I could admit it."

Several other jurors sworn to try the case testified that while they did not have religious or conscientious scruples against the death penalty nor opposed it in principle, they would not inflict it unless in their judgment the facts and circumstances of the case justified it. There can be no doubt in anyone's mind from the evidence in this case that the circumstances of the killing and mutilation of Sonja McCaskie justified the death penalty.

The United States Supreme Court said in Witherspoon, the jury in a capital case must "express the conscience of the community on the ultimate question of life or death." *Id.* at p. 519. And that, ". . . in a nation less than half of whose people believe in the death penalty, a jury composed exclusively of such people cannot speak for the community. Culled of all who harbor doubts about the wisdom of capital punishment—all who would be reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority." *Id.* at p. 520.

That is not so in Nevada. The death penalty is still authorized by our law, and as recently as the 1969 session of the Nevada State Legislature efforts to outlaw capital punishment

were unsuccessful. The majority of Nevada's people, and the conscience of our communities, permit execution in a proper case.

If Witherspoon stands for the rule that excuse of *but one* prospective juror for cause simply because he voiced general objection to the death penalty or expressed conscientious or religious scruples against its infliction constitutionally voids the death penalty, then I am wrong in my interpretation of it. I can find no such case from the United States Supreme Court.

Considering this case was tried nearly five full years before the United States Supreme Court decided Witherspoon, remarkable compliance was unknowingly and unwittingly had with that mandate. It simply cannot be said in this case that a Nevada court permitted a "hanging jury" or "stacked the deck" against appellant.

BATJER, J., dissenting in part and concurring in part:

I join with CHIEF JUSTICE COLLINS in his dissent, emphasizing the following points: It was forthrightly stated in Witherspoon v. Illinois, 391 U.S. 510 (1968), that the issue in that case was narrow, and I see the issue in this case in the same light. In *Witherspoon,* the High Court placed its stamp of approval on a state's right to exclude from the jury, in a capital case, those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them.

For a prospective juror to come within these categories of exclusion it is not necessary that he flatly state, "I will never vote to impose the death penalty," or "I refuse even to consider its imposition." It is sufficient if those attitudes can be inferred from his voir dire responses.

In this case, while the examination was not as extensive as might be desirable, the message was evident. In the answers from all but three of the eleven jurors excused under NRS 175.105(9), the message was clear that they would not vote to impose the death penalty. *Witherspoon* does not require from the prospective juror a law-defying, rebellious attitude, indicating that he would never vote for the death penalty, but it can come from his conscience, even though that case indicates that merely having "conscientious scruples against inflicting it" is not sufficient for exclusion. Apparently eligibility for exclusion is a matter of degree. If a prospective juror has a hard core objection to the death penalty, he is excusable, but if his attitude is just a queasy, conscientious scruple, he must serve.

As I read the responses from all but three of the eleven

excused veniremen it is indicated to me that they could not or would not impose the death penalty and their discharge was proper.

Now, based on the cold record and without having the opportunity to observe their physical demeanor and reaction, I will proceed to examine the responses of veniremen Edwards, Bilbrew and Minedew:

1. Dee A. Edwards not only stated that she didn't believe in the death penalty and believed that every person should have a chance to reform, but she also stated that she could not be a fair and impartial juror. The State challenged her under both NRS 175.105(9) and [151.100(2) sic] 175.100(2).[1] Even if she might not have been disqualified under NRS 275.105(9) and *Witherspoon* she was properly challenged and excused under NRS 175.100(2) for actual bias.

2. Rosie L. Bilbrew stated that she worked for a policeman, and that she had discussed the case at some length with his wife and that she was, "not for capital punishment." Whereupon, counsel for the defense stipulated that she be excused.

While defense counsel indicated that his offer to stipulate was prompted by NRS 175.105(9), it is just as easy to believe that trial strategy prompted him to have her excused because of her employer-employee relationship. With this strategy he saved a peremptory challenge.

3. Mickie Minedew's responses were somewhat less than clear. At first she indicated that she was "not sure" about her position with reference to the death penalty, then in substance she stated that because of her conscientious thoughts on the general subject of capital punishment she would be precluded from returning the death penalty. Later she specifically denied that she would not return the death penalty and she stated that she could return a guilty verdict if it was supported by the evidence.

It appears, that under the *Witherspoon* mandate, Mickie Minedew may have been improperly excused, however, I agree with the Chief Justice that one juror improperly excused out of the eighty that were examined is not "crossing the line of neutrality" and the Bean jury was not "a tribunal organized to return a verdict of death."

Based solely on the responses of the nine prospective jurors who were excused, excluding Mickie Minedew and Rosie L.

[1]NRS 175.100(2) reads: "For the existence of a state of mind on the part of the juror which leads to a just inference, in reference to the case, that he will not act with entire impartiality, which is known in this Title as actual bias."

Bilbrew, I believe that the decision of any court which would have required them to sit as jurors in this case would have forced this case to be tried by a biased, partial and prejudiced jury. The concept of an impartial jury as described by Justice Story in United States v. Cornell, 25 Fed. Cas. 650 (1820), would never have been achieved: "To insist on a juror's sitting in a cause when he acknowledges himself to be under influences, no matter whether they arise from interest, from prejudices, or from religious opinions, which will prevent him from giving a true verdict according to law and evidence, would be to subvert the objections of a trial by jury, and to bring into disgrace and contempt, the proceedings of courts of justice. We do not sit here to procure the verdicts of partial and prejudiced men; but of men, honest and indifferent in causes. This is the administration of justice [which is required]. . . ."

I turn now to a point which I believe further compels us to affirm the penalty in this case.

With the exception of veniremen Minedew and Edwards, everyone of the eleven prospective jurors who stated that they would not assess the death penalty or had voiced general objection to conscientious or religious scruples against inflicting the death penalty were excused upon the stipulation of defense counsel and the district attorney. In almost every instance defense counsel offered the stipulation before the district attorney could ask any questions of the prospective juror. These stipulations were made in open court, during trial, in the presence of the appellant and without any objection being voiced by him.

Stipulations are of an inestimable value in the administration of justice (Hayes v. State, 252 A.2d 431 (N.H. 1969)), and valid stipulations are controlling and conclusive and both trial and appellate courts are bound to enforce them. Burstein v. United States, 232 F.2d 19 (1956); Foote v. Maryland Casualty Company, 186 A.2d 255 (Pa. 1962); Pierson v. Allen, 409 S.W.2d 127 (Mo. 1966); Bearman v. Camatsos, 385 S.W.2d 91 (Tenn. 1964).

Stipulations made by an accused or by his counsel in his presence during trial are as binding and enforceable thereafter as are stipulations made by parties in civil actions. Brookhart v. Haskins, 205 N.E.2d 911 (Ohio 1965). In Scott v. Justice's Court, 84 Nev. 9, 435 P.2d 747 (1968), the statute there required that an amended complaint be filed within one day, however, the attorney for the accused stipulated that the district attorney could be permitted to file the amended complaint within 30 days. We approved the stipulation and relied on

Garaventa v. Gardella, 63 Nev. 304, 169 P.2d 540 (1946), where it was held to be error when the trial judge did not honor the stipulation of the parties waiving a rule of evidence.

Constitutionally protected rights may be waived by an accused and likewise such a waiver can be accomplished upon the stipulation of counsel when it is made in the presence of the accused who makes no objection to it. People v. Cohen, 210 P.2d 911 (Cal.App. 1949).

Pointer v. Texas, 380 U.S. 400 (1965), held that the right granted to an accused by the Sixth Amendment to confront the witness against him, which includes the right of cross-examination, is a fundamental right essential to a fair trial and is made obligatory on the states by the Fourteenth Amendment. In People v. Andrews, 44 Cal.Rptr. 94 (1965), decided shortly after Pointer v. Texas, supra, that court held that the stipulation of the accused's attorney, made in open court, in the presence of the accused and without his objection, that the case could be tried on the transcript of testimony taken at the preliminary hearing, was a waiver by the accused of his constitutionally guaranteed right to be confronted by witnesses at trial.

Here the attorney for the appellant offered the stipulations without any solicitation from the district attorney. In some, but not every instance, he premised his offer by the statement: "We will anticipate the challenge of counsel."

Every person who stands accused of a felony has the right to counsel (Gideon v. Wainwright, 372 U.S. 335), but unless counsel's power to control the strategy and tactics of the trial are maintained and protected his efforts will become ineffective.

A stipulation excusing a prospective juror is not the same category as an accused's failure to object in the trial court to the exclusion of a venireman. Boulden v. Holman, 394 U.S. 478 (1969). I believe that we must honor the stipulations of defense counsel as being a part of his trial strategy and tactics and affirm the penalty in this case.

In all other respects, I concur with the majority opinion and would therefore affirm the judgment in its entirety.